No. 21-3404

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

VON CLARK DAVIS, *Petitioner-Appellant*,
v.
WARDEN, Chillicothe Correctional Institution, *Respondent.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
CASE NO. 2:16-cv-00495
_____

PETITIONER-APPELLANT VON CLARK DAVIS'S
MOTION FOR AN EXPANDED CERTIFICATE OF APPEALABILITY
_____

THIS IS A DEATH PENALTY CASE

**Deborah L. Williams**
Federal Public Defender
**Erin G. Barnhart (0079681)**
*Lead/Trial Counsel*
**Jordan S. Berman (0093075)**
*Co-Counsel*
Assistant Federal Public Defenders
Office of the Federal Public Defender for the Southern District of Ohio
Capital Habeas Unit
10 West Broad Street, Suite 1020
Columbus, OH  43215-3469
Telephone: (614) 469-4141
Facsimile: (614) 469-5999
Erin_Barnhart@fd.org
Jordan_Berman@fd.org
Counsel for Petitioner-Appellant Von Clark Davis

# TABLE OF CONTENTS

I.    Introduction .................................................................................1

    A.    Background ............................................................................3

    B.    Request to Expand the COA ..................................................9

II.   The COA Standard Favors Expansion. .............................................10

III.  This Court Should Grant Davis a COA on His Claim that His
    Jury Waiver was Not Knowing, Intelligent and Voluntary. ..............11

    A.    Jurists of reason could disagree with the District Court's
        findings as to the merits of Davis's claims. ...........................12

        1.    Davis's jury waiver was not voluntary because the
            trial court's denial of his motion to sever forced
            him to waive jury. ...........................................................12

        2.    Davis's jury waiver was not knowing and
            intelligent because he did not know that two of the
            three judges on his panel represented a party
            adverse to him in a prior case. .......................................13

        3.    Davis's jury waiver was not knowing and
            intelligent because he did not know at the time of
            waiver that the Ohio Supreme Court would refuse
            to apply the rule of *Penix* to his case and hold him
            eligible to be resentenced to death...............................15

        4.    Davis's waiver was involuntary because did not
            know—at the time he waived his right to a jury in
            favor of being tried before three specifically
            identified judges—that he was also waiving his
            jury-trial rights twenty-five years in the future,
            when he would instead be tried before an entirely
            different panel of three unknown judges. ......................17

    B.    Conclusion ..........................................................................18

IV.   This Court Should Grant Davis a COA on His Claim that the
    State Courts Violated Davis's Rights Under the Sixth and
    Eighth Amendments and the Due Process Clause When They
    Enforced His Jury Waiver at Two Resentencing Hearings...............18

A.  The Second Ground for Relief raises violations of Davis's constitutional rights that are related to, but independent of, the violations raised in the First Ground for Relief. ..................................................................19

　　1.  Sub-Claim 2(A) – First Resentencing ...........................20

　　2.  Sub-Claim 2(B) – Second Resentencing ......................20

B.  Jurists of reason could disagree with the District Court's resolution of Davis's constitutional claims alleged in this Ground for Relief, so the COA should be expanded. ..............22

　　1.  Jurists of reason could find that Sub-Claim 2(B) is cognizable on collateral review. ...................................22

　　2.  Jurists of reason could disagree with the District's Courts findings as to the merits of both Sub-Claims. ................................................................25

　　　　a.  Davis should have been allowed to withdraw his jury waiver at both resentencing hearings. .............................................25

　　　　b.  Enforcing Davis's jury waiver contravened the text of the waiver, and denying his motion to withdraw violated his constitutional rights to a knowing and intelligent waiver. .................................................29

C.  Conclusion ...............................................................................34

V.  This Court Should Grant a COA on Davis's Claim That His Right to Effective Assistance of Counsel was Violated when Trial Counsel Failed to Reasonably Investigate and Present Mitigating *Skipper* Evidence. ...............................................................34

A.  Counsel's failure to investigate highly relevant evidence was deficient performance, to Davis's prejudice. ....................35

B.  A certificate of appealability should be granted where reasonable jurists could find that the state court's decision was contrary to clearly established federal law. ........41

C.  Conclusion ...............................................................................42

VI.   This Court Should Grant a COA on Davis's Claim That His
      Right to Effective Assistance of Counsel Was Violated when
      Trial Counsel Failed to Reasonably Investigate and Present
      Mitigation Evidence. ........................................................................43

      A.    Davis was denied effective assistance of counsel when
            counsel called Cynthia Mausser as a mitigating witness
            and failed to adequately investigate and present Dr.
            Robert Smith's mitigating evidence. ........................................46

      B.    Davis was denied effective assistance of counsel when
            counsel failed to call mitigation investigator John Lee
            and failed to effectively investigate and present
            mitigating evidence from Davis's family. ...............................55

      C.    Conclusion ........................................................................63

VII.  This Court Should Grant Davis a COA on His Claim that Trial
      Counsel Ineffectively Failed to Move to Recuse Judge Nastoff........64

VIII. This Court Should Grant Davis a COA on His Claim that Trial
      Counsel Ineffectively Failed to Investigate and Present
      Mitigating Evidence About The Circumstances of Davis' Prior
      Conviction. .........................................................................70

IX.   Conclusion........................................................................78

CERTIFICATE OF SERVICE

## I.    Introduction

Von Clark Davis has been on death row in Ohio since 1984. He was originally convicted by a three-judge panel of the Butler County Court of Common Pleas for aggravated murder of Suzette Butler and sentenced to death via the electric chair in 1984. Since then, he has been resentenced to death twice and faced no less than seven execution dates. His prison record over the past three decades has been exemplary and, over time, convincingly demonstrates his ability to function in prison at a high and very safe level. Yet each time he has faced a capital sentence, the state court has given this increasingly weighty mitigating factor less and less weight. Further, the state courts have refused to allow Davis to withdraw the jury waiver he entered in 1984, even though it was involuntary, unintelligent, and unknowing at the time he entered it, and became significantly more so over the next twenty-five years.

In 2007, this Court granted penalty phase relief to Davis because the state court had wrongly prevented him from introducing *Skipper* evidence of his good prison behavior at his first resentencing hearing. By the time his second resentencing commenced in 2009, that powerful evidence had multiplied exponentially, to constitute an extraordinary twenty-five year record of good behavior and contributions with only a single, and minor, write-up. Yet inexplicably, counsel at his second resentencing introduced just a *single two-page*

*summary* of Davis's extensive prison file marked by consistent good conduct. Counsel failed to introduce even all of the *Skipper* evidence proffered in 1989, not to mention any of the additional twenty years' worth of similarly powerful evidence. This Court had found that the *Skipper* evidence from just the few years proffered in 1989 was powerful; undoubtedly two decades more worth of that evidence would have been even more compelling.

What's more, Davis had waived his rights to a jury trial in 1984 only because the trial court refused to try separately his charge for murder with his charge for having a weapon under disability. The weapon charge was based on his prior conviction for another murder. The prejudicial impact of a previous murder conviction during the trial of a subsequent murder charge is so obvious that the Ohio General Assembly crafted a procedure for a defendant standing trial for aggravated murder based on a prior murder to prevent the jury from hearing about the first murder conviction during the guilt phase of a capital trial. Davis elected to exercise this procedure to keep the jury from hearing aggravating circumstances of his prior murder when determining whether to convict him with Ms. Butler's murder. But Davis's election turned out to be meaningless because the Court refused to grant his motion to sever the two counts. This denial meant that at a joint trial of both counts, all the facts of his prior murder conviction would come in to prove the weapon-under-disability charge. Thus, although Davis did not wish to

2

give up his rights to a jury trial, he was forced to do so when the court refused to sever Counts One and Two.

Davis respectfully requests this Court expand his certificate to include his First, Second, Third, Seventh, Eighth, and Sixteenth Grounds for Relief, so that he may raise these and other important related claims on appeal.

### A.     Background

Davis began dating and living with Suzette Butler in May of 1983. (Tr., R. 5-3, PageID 7518.) Both Davis and Ms. Butler were involved with multiple partners during their relationship. (Tr. R. 5-8, PageID 8467.) By December, Davis had moved out. (Tr., R. 5-3, PageID 7519.) Barred from possessing a weapon as a result of his prior conviction, Davis asked two men to purchase a gun and bullets for him on December 12, 1983. (Tr., R. 5-2, PageID 7289-92, 7309-13.) Sometime after 5:00 p.m., Davis arrived at the American Legion bar in Butler County after having already consuming alcohol throughout the day. (*Id.* at PageID 7317, 7335-36.) Davis first talked to Ms. Butler individually and then sat at a table with her and her friend, Mona Aldridge. (*Id.* at PageID 7336-37.) A few minutes later, Davis and Ms. Butler walked outside of the bar. (*Id.* at PageID 7337.) Shortly thereafter, Ms. Aldridge cracked the bar's door open to look outside for Ms. Butler and said she observed Davis standing three or four feet away from Ms. Butler

3

pointing a gun at her. (*Id.* at PageID 7338-39.) Ms. Butler died as a result of four gunshot wounds to the head. (*Id.* at PageID 7247.)

On June 11, 1984, Davis was convicted by a three-judge panel of causing Ms. Butler's death with prior calculation and design. (Tr., R. 5-3, PageID 7607.) Before waiving his jury-trial rights, Davis requested and obtained the identities of the judges who would make up his panel. (Motion for Notice of Prospective Three-Judge Panel, Apr. 27, 1984, R. 4-1, PageID 212.) The defense desired to know what judges would be on a three-judge panel if Davis were to waive jury to properly advise their client in making an informed waiver decision. (Pretrial Tr., R. 5-1, PageID 7209.) Only after he was given this information did he waive jury, and his jury waiver specified that he was waiving to these three specific judges. (Jury Waiver and Election of Three-Judge Panel, R. 4-3, PageID 433.)

The three-judge panel convicted and sentenced Davis to death. On direct appeal, however, the Ohio Supreme Court reversed his death sentence and remanded for a new penalty phase trial. *State v. Davis*, 528 N.E.2d 925 (1988) (*Davis II*).[1]  It held that Davis would again be eligible for a death sentence upon

---

[1] Davis will continue to use the labels the District Court recently set forth for the prior relevant proceedings:

> l. *Davis I: State v. Davis*, 12th Dist. Butler No. CA84-06-071, 1986 WL 5989 (May 27, 1986) **(Appeal from conviction and first sentencing to death);**

2. *Davis II: State v. Davis*, 38 Ohio St. 3d 361 (1988) **(Appeal from conviction and first sentencing to death);**

3. *Davis III: State v. Davis*, 12th Dist. Butler No. CA89-09-123, 1990 WL 165137 (Oct. 29, 1990) **(Appeal from second sentencing to death);**

4. *Davis IV:* State v. *Davis*, 63 Ohio St. 3d 44 (1992) **(Appeal from second sentencing to death);**

5. *Davis V: State v. Davis*, No. CR83-12-0614 (Butler Cty. C.P. Jun. 30, 1995) (State Court Record, R. 4-20, PageID 2158-66) **(First postconviction petition);**

6. *Davis VI: State v. Davis*, 12th Dist. Butler No. CA95-07-124, 1996 WL 551432 (Sept. 30, 1996) **(Appeal from first postconviction petition);**

7. *Davis VII: State v. Davis*, No. 96-2547, 77 Ohio St. 3d 1520, 674 N.E.2d 372 (TABLE) (Jan. 15, 1997) **(Appeal from first postconviction petition);**

8. *Davis VIII: State v. Davis*, 86 Ohio St. 3d 212 (1999) *(per curiam)* **(Appeal from application to reopen direct appeal);**

9. *Davis IX: Davis v. Bagley*, No. C-1-97-402, R. 16-2, PageID 8947-9032 (S.D. Ohio Jan. Sept. 4, 2001) (Graham, J.) **(Habeas petition);**

10. *Davis X: Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007) **(Appeal from habeas petition);**

1 I. *Davis XI: State v. Davis*, 12th Dist. Butler No. CA2009-10-263, 2011-Ohio-787 (Feb. 22, 2011) **(Direct appeal from second resentencing);**

12. *Davis XII: State v. Davis*, No. CR83-12-0614 (Butler Coty. C.P. Nov. 26,2012), unreported, included at State Court Record, R. 4-47, PageID 6633-50 **(Second postconviction petition);**

13. *Davis XIII: State v. Davis*, 12th Dist. Butler, No. CA2012-12-258, 2013-Ohio-3878 (Sept. 9, 2013) **(Appeal from second postconviction petition);**

14. *Davis XIV: State v. Davis*, 139 Ohio St. 3d 122, 2014-Ohio-1615 **(Direct appeal from second resentencing);**

remand, even though it had previously held that under Ohio law prevailing at the time that death could not be an option at a resentencing trial. *See State v. Penix*, 513 N.E.2d 744 (Ohio 1987). In Davis's case, the Ohio Supreme Court held the *Penix* rule did not apply to him because he was sentenced by a three-judge panel, not a jury like Mr. Penix.

On remand, Davis moved to withdraw his jury waiver on the basis that the Ohio Supreme Court's unanticipated ruling departing from *Penix* rendered his waiving unknowing and unintelligent. (Withdraw of Jury Waiver, R. 4-11, PageID 1117-18, 1121-22.) The panel denied Davis's request and enforced the previous waiver. (*Id*. at PageID 1169.) In addition, the panel refused to allow Davis to introduce evidence of his good behavior in prison since his conviction under *Skipper v. South Carolina*, 476 U.S. 1 (1986)*.* It again sentenced him to death.

In a second direct appeal and first post-conviction proceedings, the state courts affirmed Davis's conviction and sentence. But Ohio Supreme Court Justice Wright expressed a concern, in the context of the appropriateness review, that the

---

15. *Davis XV: State v. Davis*, 144 Ohio St. 3d 1441, 2015-Ohio-3427 **(Appeal from second postconviction petition);**

16. *Davis XVI: Davis v. Ohio*, 574 U.S. 1202 (2015) **(Denial of certiorari from direct appeal from second resentencing);** and

17. *Davis XVII: Davis v. Ohio*, 136 S.Ct. 88 (Mem.) (2016) **(Denial of certiorari from appeal from second postconviction petition).**

(*See* Order, R. 64, PageID 10023 n.2)

prior determination that death was appropriate would cause the panel at the subsequent resentencing hearing to believe that there was a presumption of validity to the original death sentence, which would inappropriately require Davis to overcome a presumption as opposed to a reweighing of the aggravating factor and the mitigation anew. *State v. Davis* (*Davis IV*), 584 N.E.2d 1192, 1195 (Ohio 1992) (Wright, J., dissenting).

In federal habeas, this Court ruled that Davis was entitled to relief on his *Skipper* claim. *Davis v. Coyle* (*Davis X*), 475 F.3d 761 (6th Cir. 2007). This Court explained that "the core of the analysis in *Skipper* reflects the Court's understanding that the right of a defendant to present evidence of good behavior in prison is particularly relevant when a prediction of future dangerousness figures centrally in a prosecutor's plea for imposition of the death penalty." *Id*. at 771. After reviewing the evidence that could have been presented, *id*. at 773, this Court unanimously concluded that "[t]he *Skipper* error in this case is both indisputable and dispositive." *id.* at 775. Judges Daughtry and Cole also indicated that in subsequent proceedings, Davis should be allowed to choose to proceed before a jury. *See Davis X*, 475 F.3d at 780-81; *id*. at 783 (Gibbons, J., concurring).

Back in state court for a second resentencing hearing in 2009, none of the three judges from Davis's original panel were available. Davis moved to withdraw his twenty-five-year-old jury waiver for the reasons he had previously argued

rendered it invalid at his first resentencing, and for the additional reason that the waiver he had made in 1984 with knowledge of the three specific judges who would constitute his panel was now especially invalid, because he faced a panel composed of three completely different judges. Nevertheless, the court denied his request and enforced this quarter-century old waiver against him.

By this time, defense counsel possessed more than twelve hundred pages of Department and Rehabilitation and Correction records of Davis's quarter century on death row since his conviction. Incredibly, trial counsel presented just a few pages of *Skipper* evidence. This evidence failed to provide any anecdotal or corroborative aspects of twenty-five years of Davis's life. Moreover, without explanation, trial counsel reneged on their promise to present a mitigation specialist to testify to interviews and their substance due to the unavailability of several mitigation witnesses. Counsel also failed to, as promised, present evidence that Davis would never be paroled. On September 21, 2009, the panel sentenced Davis to death. (2nd Resent. Op., Sept. 21, 2009, R. 4-39, PageID 4924-34).

After exhausting his state-court appeals, Davis filed a petition for writ of habeas corpus before the District Court, which it denied on March 29, 2021. (R. 64, PageID 10073.) The court granted a certificate of appealability for his Fourth Ground for Relief, claiming ineffective assistance of counsel during his jury waiver, and his Eleventh Ground for relief, raising the unconstitutionality of

subjecting Davis to the death penalty after a reversal of his sentence and before a different panel of judges than the three judges who convicted him. (*Id*.) It also granted a COA with respect to the cognizability of Claims Twenty-Two through Twenty-Five regarding lethal injection, and permitted him to continue proceeding *in forma pauperis*. (*Id.*)

Davis timely filed a notice of appeal to this Court on April 28, 2021. (R. 66, PageID 10076.)

### B.    Request to Expand the COA

Davis now moves to expand his certificate of appealability to include the following additional six grounds for relief:

- First: Davis's waiver of his right to a jury trial was invalid because it was not knowing, intelligent and voluntary;

- Second: The state courts violated Davis's constitutional rights when they enforced his jury waiver at two resentencing hearings;

- Third: Davis's counsel at his second resentencing were ineffective for failing to investigate and present mitigating *Skipper* evidence;

- Seventh: Davis's counsel at his second resentencing were ineffective for failing to investigate and present mitigation evidence;

- Eighth: Davis's counsel at his second resentencing were ineffective for failing to investigate and seek recusal of a biased judge; and

- Sixteenth: Davis's counsel were ineffective for failing to investigate the circumstances surrounding the prior homicide charged in the capital specification to the aggravated murder charge.

The seriousness of these constitutional errors warrants habeas relief and, at minimum, further appellate review by this Court.

## II.    The COA Standard Favors Expansion.

To obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has explained that this "threshold question" is not demanding. *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). "The COA inquiry, we have emphasized, is not coextensive with a merits analysis. At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)). A petitioner need not prove, however, "that some jurists would grant the petition for habeas corpus." *Miller-El*, 537 U.S. at 338. In fact, "a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id*. So long as at least one judge of this Court concludes that an issue is debatable, a COA must issue, for that by itself

establishes the debatability of the issue among reasonable jurists. *See, e.g.*, *Thomas v. United States*, 328 F.3d 305, 309 (7th Cir. 2003) (COA can only be denied if a panel unanimously agrees that an issue is not debatable).

In sum, courts should be liberal in granting certificates of appealability; the requirements of § 2253(c) are "non-demanding," *Wilson v. Belleque*, 554 F.3d 816, 826 (9th Cir. 2009), and a COA should be granted unless the claim presented is "'utterly without merit.'" *Id.* (citing *Jefferson v. Welborn*, 222 F.3d 286, 289 (7th Cir. 2000)). Further, in cases where the death penalty is at issue, any doubts regarding the propriety of a certificate of appealability must be resolved in the petitioner's favor. *Skinner v. Quarterman*, 528 F.3d 336, 341 (5th Cir. 2008).

Davis meets these standards. Because Davis has made a substantial showing of the denial of a constitutional right and reasonable jurists could disagree with the District Court's finding, this Court should expand the COA.

### III.    This Court Should Grant Davis a COA on His Claim that His Jury Waiver was Not Knowing, Intelligent and Voluntary.

Davis's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution were violated because his jury waiver was not knowing, intelligent, and voluntary. (Pet., R. 6, PageID 8626.) This Court should expand Davis's COA to include his First Ground for Relief because it raises a substantial denial of a constitutional right that is at least debatable among jurists of reason.

## A.    Jurists of reason could disagree with the District Court's findings as to the merits of Davis's claims.

Davis's jury waiver was involuntary at the moment he made it for two reasons. Later developments that Davis could not have reasonably anticipated at the time of his waiver provide two additional bases for his waiver being unknowing and involuntary.

### 1.    Davis's jury waiver was not voluntary because the trial court's denial of his motion to sever forced him to waive jury.

First, the trial court's denial of Davis's motion to sever left him no choice but to waive jury. The waiver was, therefore, invalid, because it was not voluntary.

The aggravated murder indictment charged Davis with a capital specification of a prior purposeful homicide under Ohio Revised Code § 2929.04(A)(5) and one count of having a weapon under disability under Ohio Revised Code § 2923.13. Before his capital trial began, Davis elected under Ohio Revised Code 2929.022 to have his specification determined by the court. (Mot. Hr'g., May 4, 1984, R. 5-1, PageID 7222; Waiver and Election, 1st P.C. Ex. G, R. 4-19, PageID 1963).

Davis also moved to have the weapon-under-disability count severed from the aggravated murder count and tried separately. He made this request so that the prior murder charge could not be introduced to the jury in the guilt-phase of his trial through this count. (R. 5-1, PageID 7212-15). The trial court, however, denied

the motion to sever, (*id.* at PageID 7215-16), forcing Davis to waive his right to trial by jury, (Aff. of Von Clark Davis, 1st P.C. Ex. H, R. 4–19, PageID 1964-65).

The District Court denied Davis's claim for relief on this ground based on this Court's observation that "'a habeas corpus proceeding is not an appropriate vehicle for this court to substitute its own judgment for that of the State of Ohio.'" (Order, R. 64, PageID 10032 (quoting *Davis X*, 475 F.3d at 778).) But this Court also noted, despite precedent to the contrary, skepticism "about the degree to which Ohio's joinder provisions undercut the protection afforded a capital defendant by Ohio Revised Code § 2929.022(A), especially given the heightened concerns regarding undue prejudice in a capital case." *Davis X*, 475 F.3d at 778. This skepticism demonstrates the disagreement among reasonable jurists necessary to provide encouragement for this claim to proceed further, meeting the COA standard.

> **2.    Davis's jury waiver was not knowing and intelligent because he did not know that two of the three judges on his panel represented a party adverse to him in a prior case.**

Second, at the time he waived jury, Davis was unaware that two of the three judges on his panel—Judges Stitsinger and Moser—had previously been involved in litigation against Davis. In 1970, the Federal National Mortgage Company instituted foreclosure proceedings on the house owned by Davis and his wife, Ernestine. (1st P.C. Ex. L, R. 4-19, PageID 1971-78). The mortgage company was

13

represented by then-attorneys John Moser and William Stitsinger.  (*Id*. at 1975-76.)

A judgment entry and decree of foreclosure concerning Davis's home was

ultimately entered in the case. (1st P.C. Ex. M, R. 4-19, PageID 1979.) Judge

Stitsinger and Moser did not disclose their involvement in these proceedings to

Davis at the time of his waiver.

Knowing about the judges' past litigation against Davis would have affected

his decision to be tried by them. (1st P.C. Ex. N, R. 4-19, PageID 1980-81.) Had

Davis known these facts about two of the judges on his panel, he would not have

waived his right to trial by jury because the two judges were "instrumental" in

taking away his home. (*Id*.)

The trial court's failure to disclose these facts to Davis rendered his jury

waiver in 1984 invalid. And although Davis was tried by an entirely different panel

of judges in 2009, the prejudice from 1984 remained, because the state courts

refused to allow Davis to withdraw his original waiver at that second resentencing.

The District Court denied relief as to this Sub-Claim, asserting that Davis

has not met his burden of demonstrating that the waiver is *prima facie* invalid

merely because Judges Moser and Stitsinger previously worked on a foreclosure

action against Davis and his then-wife, Ernestine, fourteen years before the first

trial. (Order, R. 64, PageID 10033). The Court noted that a foreclosure action

differs in nature from a criminal proceeding, and that there is no evidence

14

suggesting that the Court should disbelieve the judges' statements that they had no memory of being involved in the foreclosure action at the time of the trial. (*Id.*) Nonetheless, jurists of reason could disagree with the District Court's holding, finding sufficient evidence of bias or disbelief of the judges' statements. Accordingly, this Court should grant a COA on this subclaim.

> **3.    Davis's jury waiver was not knowing and intelligent because he did not know at the time of waiver that the Ohio Supreme Court would refuse to apply the rule of *Penix* to his case and hold him eligible to be resentenced to death.**

Subsequent to his initial trial, two unexpected developments in Davis's case additionally rendered his waiver unknowing and involuntary.

First, in his initial direct appeal, the Ohio Supreme Court found reversable error in the sentencing phase of Davis's original trial, but held that he would be eligible to receive the death penalty on remand. *State v. Davis* (*Davis II*), 528 N.E.2d 925, 936 (Ohio 1988). The state court arrived at that decision although it had previously held in *State v. Penix*, 513 N.E.2d 744, 748 (Ohio 1987), that a sentencing-phase error rendered the defendant ineligible for the death penalty on remand. The court reached different conclusions in these cases because Davis's trial occurred before a three-judge panel, while Mr. Penix's trial was before a jury.

Because of this, Davis was not—and could not have been—aware of all the relevant circumstances and consequences of his waiver at the time he made it. *Penix* was the law at the time of his waiver, and he had no reason to suspect that

the state supreme court would distinguish it from his case based on his decision to be tried by a three-judge panel instead of a jury. Davis's jury waiver was thus unknowing and unintelligent because he could not have anticipated that the Ohio Supreme Court would hold that the *Penix* rule did not apply to him. Indeed, for the reasons stated more fully below in Davis's argument for a COA based on the *Penix* subclaim of his Second Ground for Relief, the state supreme court's decision represented "an arbitrary disregard of [Davis's] right to liberty." *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). By definition, the "arbitrary" nature of the Ohio Supreme Court's decision means Davis could not have anticipated it at the time he waived jury.

The District Court denied Davis relief as to this Sub-Claim despite this Court's statement that "the practice of finding a jury waiver inherently revoked '*should certainly inform* the sentencing court's determination of the viability of Davis's jury waiver on remand' where 'additional evidence would be introduced from both the prosecution and defense, as is likely to occur on remand of [Davis's] case.'" *Davis X*, 475 F.3d at 781. The District Court concluded that this standard— "should clearly inform"—failed to demonstrate a violation of clearly established federal law under 28 U.S.C. § 2254(d). (Order, R. 64, PageID 10032.) But this Court's observation supports Davis's argument that his waiver was invalid *at the time he made it*: a reasonable defendant in his position would not have anticipated

16

at the time he waived jury that the waiver would continue to be enforced against him at subsequent resentencings under materially different circumstances.

In any event, the COA standard is not coextensive with a merits analysis. Rather, for a COA to issue, it is only required that "jurists of reason could disagree with the district court's resolution of [the applicant's] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). This Court's prior characterization of jury waiver revocation as a practice that "should certainly inform" the sentencing court's determination of the waiver's viability demonstrates that jurists of reason could disagree with District Court's determination. Because the validity of the jury waiver and the subsequent constitutional violations are debatable among jurists of reason, Davis meets the standard necessary for a COA to issue.

> **4.      Davis's waiver was involuntary because did not know—at the time he waived his right to a jury in favor of being tried before three specifically identified judges—that he was also waiving his jury-trial rights twenty-five years in the future, when he would instead be tried before an entirely different panel of three unknown judges.**

Further, in both resentencings, the state courts refused to allow Davis to withdraw his jury waiver. For the reasons stated more fully below in Davis's argument for a COA based on his waiver being reinforced at resentencing hearings in his Second Ground for Relief, at the time he waived jury in 1984, Davis would

not reasonably have expected to be held to that waiver at a new sentencing hearing. *See infra* § IV.B.2.a.

Moreover, at his second resentencing in 2009, his waiver was 25 years old, and unsurprisingly, the circumstances that existed at the time he initially waived jury had materially changed. As he explains in detail below, Davis could not have anticipated in 1984 that his waiver to three specifically named judges would nevertheless constitute a waiver to be tried by three entirely different judges. *See infra* § IV.B.2.b.

### B.    Conclusion

For all of these reasons, this Court should expand Davis's COA to include the knowing-and-voluntary claims in his First Ground for Relief.

### IV.    This Court Should Grant Davis a COA on His Claim that the State Courts Violated Davis's Rights Under the Sixth and Eighth Amendments and the Due Process Clause When They Enforced His Jury Waiver at Two Resentencing Hearings.

The trial court violated Davis's rights under the Sixth and Eighth Amendments and the Due Process Clause when it enforced his original jury waiver at two subsequent resentencing hearings. (Pet., R. 6, PageID 8640.) Davis's Second Ground for Relief makes a substantial showing of the denial of a constitutional right that is, as a threshold matter, debatable among jurists of reason, so he is entitled to a COA.

18

**A.    The Second Ground for Relief raises violations of Davis's constitutional rights that are related to, but independent of, the violations raised in the First Ground for Relief.**

Davis's constitutional rights were violated when the trial court enforced his original jury waiver at two resentencing hearings. His First Ground for Relief argues that the jury waiver was unknowing and unintelligent *at the time it was made,* making it invalid from the start. (Pet., R. 6, PageID 8565.) Before his 1984 trial, Davis could not anticipate either that the Ohio Supreme Court would refuse to apply the rule of *State v. Penix*, 513 N.E.2d 744 (Ohio 1987), and instead hold him eligible for death on resentencing, or that he would be held to his waiver twenty-five years in the future when facing a different panel than the one before whom he agreed to be tried and sentenced. (*Id.*) Contrary to the District Court's finding that Sub-Claim 2(A) is "'virtually identical'" to Sub-Claim 1(B), (Order, R. 64, PageID 10036 (quoting Report & Recommendation, R. 51, PageID 9660)), Davis's Second Ground for Relief does not merely repeat this accounting of why his waiver was impermissible *at the time it was made*. Instead, the Second Ground for Relief shows that the trial court *later* denied Davis his constitutional rights by refusing to grant his motion to withdraw the jury waiver in his two subsequent resentencings. This is a related, but separate, Ground for Relief raising two subsequent violations of Davis's rights by the trial court at his resentencings, in addition to the constitutional defects in the initial waiver.

### 1.    Sub-Claim 2(A) – First Resentencing

The Ohio Supreme Court held in *State v. Davis* (*Davis IV*), 584 N.E.2d 1192, 1195 (Ohio 1992), that Davis could not withdraw his jury waiver at his first resentencing. This is the basis for Sub-Claim 2(A): that enforcement of the waiver violated his rights under the Eighth and Sixth Amendments and the Due Process Clause. (Pet., R. 6, PageID 8565.) Because Davis could not have predicted at the time of his original waiver that the Ohio Supreme Court would hold *Penix* inapplicable to his case and decide he was eligible to be resentenced to death, (*id.*), the decision to then hold Davis to his unknowing and unintelligent waiver at the resentencing represented "an arbitrary disregard of [Davis's] right to liberty" and accordingly violated his due process rights, *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

### 2.    Sub-Claim 2(B) – Second Resentencing

Davis was also held to the original jury waiver at his second resentencing. (2nd Resent. Op., Sept. 21, 2009, R. 4-39, PageID 4926.) The state court again impermissibly enforced the waiver 25 years after it was made, under dramatically different circumstances. This is the basis for Sub-Claim 2(B): that the trial court violated Davis's rights by enforcing the stale, quarter-century-old jury waiver in an entirely new hearing, in front of entirely new judges. (Pet., R. 6, PageID 8565.) Everything changed in Davis's case between 1984 and 2009. He was represented

by new trial attorneys. (Traverse, R. 29, PageID 9177-79.) New and substantially different mitigating evidence existed and was presented, spanning eleven different topic areas. (*Id.*) Some categories of mitigating evidence were either substantially stronger in 2009 as compared to 1984 (*i.e.* Davis's decades-long record of good behavior in prison), or entirely new (*i.e.* Davis's advanced age). (*Id.*) Further, in 2009 the trial court specifically did not review the mitigation phase testimony or transcript from the previous proceedings, (*see* 2nd Resent. Tr., Sept. 8, 2009, R. 5-7, PageID 8208, 8211), so the new panel considered an entirely different factual predicate, (Traverse, R. 29, PageID 9177-78).

Most importantly, at his second resentencing in 2009, Davis faced an entirely new panel of judges, none of whom were even judges in 1984 when the jury waiver that they impermissibly enforced was originally made. (*Id.* at 9177.) In 1984, Davis waived his right to a jury in return for a specific, named panel:

> I, Von Clark Davis, defendant in the above cause, appearing in open court this 8th day of May, 1984, with my attorneys * * * do hereby voluntarily waive my right to trial by jury and elect to be tried by a court to be composed of three judges, *consisting of Judges Henry J. Bruewer, William R. Stitsinger, and John R. Moser . . .*

(Jury Waiver and Election of Three-Judge Panel, R. 4-3, PageID 433 (emphasis added).) None of these three judges oversaw his second resentencing in 2009, so the court violated Davis's rights by holding him to his stale jury waiver while itself breaching the explicit terms of the waiver.

21

Notwithstanding the defects of the jury waiver at the time it was made, which the First Ground for Relief sets out, these two subsequent enforcements of the waiver are independent grounds for relief.

> **B.      Jurists of reason could disagree with the District Court's resolution of Davis's constitutional claims alleged in this Ground for Relief, so the COA should be expanded.**

The District Court dismissed Sub-Claim 2(B) as non-cognizable on collateral review and barred under 28 U.S.C. § 2254(d), and Sub-Claim 2(A) as barred under 28 U.S.C. § 2254(d), (Order, R. 64, PageID 10035-36), erroneously conflating Sub-Claim 2(A) with Sub-Claim 1(B), as discussed above. Because jurists of reason could disagree with the District Court's findings on both Sub-Claims, this Court should expand the COA.

> **1.      Jurists of reason could find that Sub-Claim 2(B) is cognizable on collateral review.**

By the time of Davis's second resentencing, the U.S. Supreme Court had clearly established that the right to a jury applies to capital sentencing. *Ring v. Arizona*, 536 U.S. 584, 609 (2002) ("Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury.") (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494, n.19 (2000)). Nevertheless, the District Court held this Sub-Claim to be non-cognizable because it was based on *Hurst v. Florida*, 577 U.S. 92 (2016), which the Supreme Court had not yet decided in 2009. Because

this right was clearly established by *Ring*, before *Hurst*, jurists of reason could disagree with the District Court's finding of non-cognizability.

The District Court even recognized elsewhere that the Sixth Amendment right to a jury in capital sentencing long pre-dated *Hurst:* "*Hurst* was a straightforward application of *Ring v. Arizona*, 536 U.S. 584 (2002), not a watershed change in criminal practice." (Decision and Order, R. 34, PageID 9427.) Yet the District Court nevertheless found this claim non-cognizable, (Decision and Order, R. 64, PageID 10035), because *Hurst* was not clearly established federal law at the time of Davis's second resentencing. *Hurst* itself repeatedly made clear that prior clearly established federal law in *Ring* and *Apprendi* dictated the result in 2016. It held that increasing a defendant's authorized punishment based on judicial factfinding violates the Sixth Amendment "[i]n light of *Ring*," and that the conclusion that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury" was "wrong, and irreconcilable with *Apprendi* [*v. New Jersey*, 530 U.S. 466 (2000)]." *Hurst*, 577 U.S. at 101. The court emphasized that it had already come to this conclusion in 2002:

> Indeed, *today is not the first time we have recognized as much*. In *Ring*, we held that another pre-*Apprendi* decision—*Walton*, 497 U.S. 639—could not "survive the reasoning of *Apprendi*." 536 U.S.[] at 603. *Walton*, for its part, was a mere application of *Hildwin*'s holding to Arizona's capital sentencing scheme. 497 U.S.[] at 648.

*Id.* (emphasis added).

Accordingly, at the time of Davis's resentencing in 2009, and his direct appeal in 2014, the state courts violated Davis's constitutional rights as established by *Apprendi* and *Ring* when they forced him to be sentenced before three completely new judges twenty-five years after his jury waiver, despite the fact that he had specified that he was forgoing his jury-trial rights in favor of being tried and sentenced by three specific judges. (Jury Waiver and Election of Three-Judge Panel, R. 4-3, PageID 433.) Even before his second resentencing, this Court warned the state courts against such behavior. *Davis X*, 475 F.3d 761, 780 (6th Cir. 2007) (recognizing "a legitimate question as to whether a criminal defendant should be held to a jury waiver entered almost 25 years before his newly-mandated sentencing hearing"). Because jurists of reason could find that the right to a jury in capital resentencing predated Davis's second resentencing, and disagree with the District Court's finding that Sub-Claim 2(B) is non-cognizable, this Court should issue a COA.

2.    **Jurists of reason could disagree with the District's Courts findings as to the merits of both Sub-Claims.**

a.    **Davis should have been allowed to withdraw his jury waiver at both resentencing hearings.**

The state courts violated Davis's constitutional rights in both resentencings when they refused to accept his motions to withdraw the jury waiver. (Traverse, R. 29, PageID 9181.) Prevailing practices and this Court's decision in *Davis X* demonstrate that jurists of reason could debate whether Davis has made a sufficient showing of the denial of his constitutional rights, meeting the COA threshold.

For over a century, courts have concluded that the waiver of a jury trial for one proceeding does not bind a party or parties for subsequent proceedings after reversal and remand. *See, e.g.*, *F.M. Davies v. Porter*, 248 F. 397, 398 (8th Cir. 1918) (Jury waiver "does not affect the right of either party to demand a trial by jury, on a second trial, after the judgment in the first trial has been reversed and remanded for a new trial."); *In re Hulcher Servs.*, 568 S.W.3d 188, 190 (Tex. App. 2018) ("[A] party who waived a jury before the original trial may nevertheless demand a jury on the remanded issue or issues.") (citing *Burnham v. N. Chicago St. Ry.*, 88 F. 627, 628-30 (7th Cir. 1898) (jury waiver applied only to the first trial, because parties can't be presumed to have had a second trial in mind when making the waiver) (also citing *Dunlap v. Brooks*, 3 Willson 425, 427 (Tex. App. 1888) (whether a party waived an initial jury trial does not control disposition after

remand, because reversal places case in position "as though no previous trial had been had")). In fact, in conflict with the Ohio Supreme Court's decision in *Davis IV*, the Illinois Supreme Court has held that a waiver of a jury trial is not valid upon a remand for a new trial. *People v. Bracey*, 821 N.E.2d 253 (Ill. 2004); *Osgood v. Skinner*, 57 N.E. 1041, 1043 (Ill. 1900) (agreement to waive a jury binds the parties "only for the particular trial.") *See also Cochran v. Stewart*, 68 N.W. 972, 973 (Minn. 1896) (Because conditions at second trial may be "wholly different," it is "hardly fair to presume that by waiving a jury for one trial the parties intended to waive a jury for any further trial that may be had.").

Davis was denied his Due Process right to withdraw the waiver and assert his right to a jury trial before both resentencing hearings, even though they were new trials under Ohio law. When Davis was before this Court previously, it noted that "under Ohio Revised Code § 2945.05, a waiver of jury trial 'may be withdrawn by the defendant at any time before the commencement of trial.'" *Davis X*, 475 F.3d at 780. It then assumed that "the resentencing hearing that we order today will not constitute a 'trial' in the sense that the petitioner's guilt or innocence is again at issue," nevertheless concluding that, in Davis's case, "the proceeding can indeed be considered the functional equivalent of 'trial' because, unlike sentencing in a non-capital case, it will take the form of an evidentiary proceeding

26

on the question of whether Davis should receive the death penalty or some form of a life sentence." *Id.*

But under Ohio law, Davis's jury waiver should have been considered inherently—not just functionally—revoked ahead of both resentencings. The *Davis X* panel noted that "Ohio courts have held, in reversing a conviction 'on the basis that the defendant was neither charged nor found guilty of an essential element of the offense,' that the defendant's 'previous waiver of a jury trial is also inherently revoked by the reversal of the conviction and the amended indictment.'" *Id.* at 781 (quoting *State v. McGee*, 715 N.E.2d 1175, 1178 (Ohio Ct. App. 1998) (brackets removed)). This Court then concluded, "[w]hile not directly on point, because Davis is not facing a new indictment, the reasoning of the Ohio court in *McGee* should certainly inform the sentencing court's determination of the viability of Davis's jury waiver on remand." *Id.* But this understates the implications of *McGee,* which directly applies to Davis's case.

Under Ohio law, both Davis and McGee returned to state court on remand in an unconvicted status, so inherent revocation applies in both cases. McGee was freed from her prior jury waiver by "the reversal of [her] conviction." *McGee*, 715 N.E.2d at 1718. Davis should have been freed from his jury waiver in exactly the same way, because this Court's remand to state court in both instances represented "the reversal of [his] conviction." *Id.* When this Court vacated Davis's sentence, he

27

no longer stood convicted, because under Ohio law, "a judgment of conviction"

contains four necessary components:

> (1) the guilty plea, the jury verdict, or the finding of the
> court upon which the conviction is based;
> (2) the sentence;
> (3) the signature of the judge; and,
> (4) entry on the journal by the clerk of court.

*State v. Baker*, 893 N.E.2d 163, 167 (Ohio 2008); *see also* Ohio Crim. R. 32(C)

("A judgment of conviction shall set forth the fact of conviction and the

sentence. . . . The judge shall sign the judgment and the clerk shall enter it on the

journal."[2]). By vacating his sentence, this Court removed one of the necessary

elements of Davis's conviction, and thus both resentencing hearings were new

trials, which returned new judgments of conviction.

Instead of being the mere "functional equivalent" of a trial, *Davis X*, 475

F.3d at 780, at which Davis arguably should have been allowed to withdraw his

jury waiver, under Ohio law both resentencings *were* new trials, meaning Davis's

jury waiver should have been inherently revoked. And even if it remained in force,

Davis had a Due Process right to withdraw the waiver before each proceeding. The

trial court violated Davis's constitutional right to a jury trial both times it refused

to allow him to withdraw his inherently revoked waiver before the resentencings

---

[2] At the time of the second resentencing, Rule 32(C) began as follows:
"A judgment of conviction shall set forth the plea, the verdict, or findings,
upon which each conviction is based, and the sentence."

that were, under Ohio law, new trials. *See Hicks,* 447 U.S. at 346 ("Oklahoma denied the petitioner the jury sentence to which he was entitled under state law. . . . Such an arbitrary disregard of the petitioner's right to liberty is a denial of due process of law."). For the purposes of a COA analysis, the *Davis X* panel's characterization of the resentencing hearings as the "functional equivalent of 'trial'" and its discussion of the doctrine of inherent revocation at least demonstrate that jurists of reason could disagree with the District Court's findings, and that Davis deserves encouragement to proceed in fully developing this claim. This Court must issue a COA.

> **b.    Enforcing Davis's jury waiver contravened the text of the waiver, and denying his motion to withdraw violated his constitutional rights to a knowing and intelligent waiver.**

It is well-established that the "controlling terms" of a defendant's waiver of rights determine the waiver's scope and applicability. *United States v. Cohen*, 888 F.3d 667, 683 (4th Cir. 2018) (interpreting express terms of an appeal waiver). This Court has previously used the language of a jury waiver to limit its enforcement to a specific phase of trial. *Branham v. Thomas M. Cooley L. Sch.*, 689 F.3d 558, 565 (6th Cir. 2012) (acknowledging that a plaintiff who waived her right to a jury "only with respect to the trial herein scheduled for September 1, 2009" had not waived her right to a jury in later proceedings for damages, had they been required). Because reasonable jurists could disagree with the District Court's

29

disposition, this claim deserves encouragement to proceed to show that the trial court's disregard for the controlling text of Davis's jury waiver violated his constitutional rights.

The text of Davis's jury waiver did not cover the possibility of resentencings, so he should not have been bound to it at either subsequent sentencing. In *Davis X,* this Court advised the state courts that "there is a legitimate question as to whether a criminal defendant should be held to a jury waiver entered almost 25 years before his newly-mandated sentencing hearing." *Davis X*, 475 F.3d at 780-81 (citing *United States v. Groth*, 682 F.2d 578, 580 (6th Cir. 1982) (noting that in federal cases in this circuit, "waiver of a jury trial does not bar a demand for a jury on retrial of the same case unless the original waiver explicitly covers this contingency")); *see also id*. (noting that "'when a reviewing court finds error in the conduct of a trial and reverses with directions for a new trial the general rule is that a litigant is not bound by his prior waiver of a jury trial unless the language of a waiver unambiguously states that it will apply in all retrials should they be ordered'" (brackets and ellipses omitted) (quoting *United States v. Lee*, 539 F.2d 606, 608 (6th Cir. 1976)). Davis's 1984 jury waiver did not mention contingencies for retrials at all, let alone unambiguously state that it would continue to apply to them. (Jury Waiver and Election of Three-Judge Panel, R. 4-3, PageID 433.) Absent such a statement, Davis should have been allowed to withdraw his jury

30

waiver at both subsequent resentencings. Enforcing the waiver violated his

constitutional rights.

The text of the jury waiver was not, however, totally devoid of unambiguous

statements of key terms. The waiver named the three judges before whom Davis

agreed to be tried:

> I, Von Clark Davis . . . elect to be tried by a court to be
> composed of three judges, consisting of Judges Henry J.
> Bruewer, William R. Stitsinger, and John R. Moser . . .

(Jury Waiver and Election of Three-Judge Panel, R. 4-3, PageID 433.) Depending

on the case, a defendant may "prefer[] the common-sense judgment of a jury to the

more tutored but perhaps less sympathetic reaction of the single judge." *Duncan v.*

*Louisiana.*, 391 U.S. 145, 156 (1968). The text of the waiver affirms that Davis

exchanged the "common-sense judgment" offered by a jury for certainty over the

identities of the "tutored but perhaps less sympathetic" judges who would decide

his fate.

The trial court repudiated this deal by enforcing the waiver at Davis's

second resentencing, when none of the three named judges were available. This

violated Davis's constitutional rights. *Cf. Santobello v. New York*, 404 U.S. 257

(1971) (applying contract-law principles and due-process concerns of fairness to

plea bargains, and remanding where the state failed to give the sentencing

recommendation promised as consideration for a guilty plea). This Court has

acknowledged that the logic of *Santobello* could arguably be extended to a breach by a trial court. *Brown v. McKee*, 340 F. App'x 254, 257 (6th Cir. 2009). *See also United States v. Coleman,* 208 F.3d 786, 792 (9th Cir. 2000) (noting the contractual aspects of a jury waiver, where the prosecutor failed to make agreed-upon sentencing recommendations as consideration for waiving jury rights, but dismissing the claim on other grounds). The Supreme Court has also recognized a contractual aspect to jury waivers, similar to that of plea bargains, as a practice in which defendants are induced to give up some rights in exchange for other benefits, meanwhile promoting a broader interest in procedural efficiency. *See Corbitt v. New Jersey*, 439 U.S. 212, 220, n.9 (1978). Davis entered into a contract with the court, exchanging his constitutional right to demand a jury trial for certainty over the make-up of the sentencing panel, meanwhile benefitting the court's interest in judicial efficiency and economy. Davis deserved the full benefit of his bargain, and where that is not possible, the right to void the contract by withdrawing his waiver.

To hold Davis to the waiver 25 years later, while the trial court breached its plain terms, is a violation of his constitutional rights. When the waiver could no longer be enforced as written, its enforcement over Davis's objections represented "an arbitrary disregard of [Davis's] right to liberty," *Hicks*, 447 U.S. 343, 346 (1980), and accordingly violated his due process rights.

32

Finally, the change in the make-up of the sentencing panel in 2009 has additional implications on the validity of the waiver beyond its plain text. In *Davis X*, this Court upheld the Ohio Supreme Court's refusal to apply *Penix* and instead hold Davis eligible for death on resentencing, distinguishing *Penix* as a jury trial case. *Davis X*, 475 F.3d at 780. That panel noted the difficulty of reassembling the original jury to retry the defendant in *Penix,* compared to the ease of reassembling the original three-judge panel to retry Davis, as happened in his first resentencing. *Id.* This practical reality was the "arguably rational" basis for distinguishing *Penix* and declining to extend it to Davis's case. *Id.* While it was arguably tenable in the first resentencing, by 2009 this key distinction had disappeared. Just like in *Penix,* Davis should not have been eligible for death on his second resentencing because it was impossible to reassemble the original sentencing body. Davis could not have predicted his case would be distinguished from *Penix* at the first resentencing, and even less so at the second, where no meaningful distinction existed between his case and Penix's, and so his jury waiver was unintelligent and unknowing, entitling him to withdraw it. When not even one of the original sentencing judges was available at the second resentencing, the new panel's enforcement of Davis's 25-year-old jury waiver was a wholly unreasonable violation of his constitutional rights.

### C.    Conclusion

Davis's Second Ground for Relief makes a substantial showing of the violation of Davis's rights by the state courts who twice refused his motions to withdraw his stale jury waiver at subsequent resentencing hearings. Because jurists of reason could disagree with the District Court's findings on these claims, this Court should expand Davis's COA to include this Ground for Relief.

### V.    This Court Should Grant a COA on Davis's Claim That His Right to Effective Assistance of Counsel was Violated when Trial Counsel Failed to Reasonably Investigate and Present Mitigating *Skipper* Evidence.

Davis was denied the effective assistance of counsel at his second resentencing hearing. Defense counsel failed to reasonably investigate and present mitigating evidence of Davis's good prison behavior even though this information was known, available, and relevant. *See Skipper v. South Carolina,* 476 U.S. 1, 5 (1986).  Moreover, defense counsel failed to present this evidence of Davis's exemplary prison record despite this Court remanding the case for a new penalty phase to consider this very evidence. *See Davis v. Coyle* (*Davis X*), 475 F.3d 761, 774-75 (6th Cir. 2007). As a result of defense counsel's failures, the trial court, yet again, failed to consider and weigh relevant mitigating evidence. The acts and omissions of counsel prejudiced Davis and denied him due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth

Amendments. *See Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362, 396-98 (2000); *Strickland v. Washington*, 466 U.S. 668 (1984).

Petitioners in this circuit have received COAs on whether they received ineffective assistance of counsel for failure to properly investigate or present mitigating evidence of good prison behavior. *See*, *e.g., Hill v. Mitchell,* 400 F.3d 308, 330 (6th Cir. 2005) (COA granted on claim that trial counsel failed to raise in mitigation the fact that he had adjusted well to prison); *Williams v. Houk*, No. 13-4253, 676 Fed. App'x. 524, 545 (6th Cir. Jan. 20, 2017) (COA granted on claim that counsel failed to introduce additional prison records showing that petitioner would have adjusted well to prison life and would not have been a danger to others). Accordingly, Davis should receive a COA on this claim as well.

### A.    Counsel's failure to investigate highly relevant evidence was deficient performance, to Davis's prejudice.

The District Court denied a COA on this claim even though this Court previously granted relief on the basis that "the record in this case establishes without doubt that" evidence about Davis's behavior and adjustment to prison life since his incarceration after his trial in 1984 "was highly relevant to the single aggravating factor relied upon by the state—that future dangerousness should keep Davis on death row." *Davis X*, 475 F.3d at 773. Despite the reversal, counsel at Davis's second resentencing ignored much of this evidence, to Davis's prejudice. Nonetheless, the District Court held that even "if true" that this Court found

"highly relevant" the extensive additional mitigation evidence in this case, "'highly relevant' is not the standard under either prong of *Strickland."* (R. 64, PageID 10040-41.) The District Court further concluded that "research and presentation of every piece of mitigation evidence is not necessary for competent representation under *Strickland."* (R. 64, PageID 10041.)

To the contrary, reasonable jurists could find that Davis's counsel's failure to investigate and present highly relevant mitigating evidence was in fact deficient performance under *Strickland*. The U.S. Supreme Court has provided specific guidance with respect to reasonable professional assistance during the sentencing phase of a capital case. *Rompilla v. Beard*, 545 U.S. 374, 381-90 (2005); *Wiggins*, 539 U.S. at 521-29; *Williams*, 529 U.S. at 395-97. In particular, the Court has recognized that counsel in a capital case has an "obligation to conduct a thorough investigation of the defendant's background" to determine the availability of mitigating evidence. *Williams*, 529 U.S. at 396; *see also Williams v. Anderson*, 460 F.3d 789, 802 (6th Cir. 2006) ("Defense counsel's complete failure to investigate before deciding not to present mitigating evidence is deficient performance as a matter of law under *Strickland*.").

Counsel's "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539

U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)) (emphasis in original). The United States Supreme Court has unmistakably recognized the importance of permitting capital defendants to put forth evidence of the likelihood of future good conduct at sentencing. *Ayers v. Belmontes*, 549 U.S. 7, 15 (2006).

The state court of appeals asserted that Davis provided "extensive . . . testimony" from Scott Nowak, Davis's prison case manager, "as to Davis's good behavior," but that is an unreasonable determination of the facts in light of the evidence presented in the resentencing hearing. *State v. Davis (Davis XIII)*, No. CA2012-12-258, 2013 WL 4806935, at ¶¶ 15-23 (Ohio Ct. App. 12th Dist. Sept. 9, 2013). Mr. Nowak testified for a meager thirteen pages without offering any substantive or anecdotal evidence regarding his interactions with Davis. (2nd Resent. Tr., Sept. 10, 2009, R. 5-8, PageID 8406-19.) In addition, defense counsel introduced only a single exhibit on this subject, a two-page institutional summary prepared by Mr. Nowak. (*Id.* at PageID 8409; R. 4-50, PageID 7112-13.) The summary provided sparse information regarding one conduct incident in January of 1990, Davis's work history, programs completed, and his placement in the extended privileges unit in May 2006. (*Id.*) Nowak provided no further information regarding his personal interactions with Davis beyond a description of what the honor block/extended privilege unit is and

identifying Davis as being placed there. (2nd Resent. Tr., Sept. 10, 2009, R. 5-8, PageID 8417-19).

The state court of appeals also concluded, inaccurately, that "the institutional summary conveyed the substance of the entire unit file[.]" *Davis XIII,* 2013-Ohio-3878, ¶ 23. Mr. Nowak's testimony and the two-page institutional summary failed to cover the full extent of the information that this Court cited as "highly relevant" for consideration by the trial court. *Davis X*, 475 F.3d at 773. For example, the two-page institutional summary did not convey the substance of the 84-page unit file. (*See* 2nd P.C. Ex. E, R. 4-46, PageID 6281-364.) Contents of the unit file that are not reflected in the institutional summary include a certificate of completion for a twelve-week stress management seminar; a job evaluation indicating that Davis was "a real good worker" and "has demonstrated excellent adjustment"; classification forms dating back to 1986 showing "responsibility [Davis] has demonstrated" and lack of disciplinary reports; Davis's GED certification; the classes he had enrolled in while incarcerated, including college courses; and his application for membership with the Vietnam Veterans of America. (*See id*.)

Defense counsel also never attempted to contact Sgt. Gordy Pullman, Capt. Oscar McGraw, social worker Herb Wendler, or any other witnesses who may have had information as to Davis' model behavior while on death row, even though the anticipated testimony of McGraw and Wendler was the basis for the

Sixth Circuit's reversal of Davis' 1989 death sentence. *Davis X*, 475 F.3d at 773;
*see also id.* at 769-70 (discussing Pullman's proffered testimony as well).

Further, Davis was never asked by his second resentencing attorneys for
names of other guards, caseworkers, or other prison personnel with whom he
interacted while incarcerated. (2nd P.C. Ex. B, Aff. of Von Clark Davis, R. 4-46,
PageID 6270.) Defense counsel could have requested a court order to interview the
witnesses, or subpoenaed the witnesses to testify. (*See* 2nd P.C. Ex. C, Aff. of Kort
Gatterdam, R. 4-46, PageID 6273.) Davis could have provided names of favorable
witnesses willing to testify on his behalf. These witnesses could have provided
relevant and essential information about how Davis responded to authority over the
years and whether he would be a risk if ever released from prison. Failing to
investigate and talk to favorable witnesses is not a thorough investigation. Defense
counsel took a minimalist approach and failed to fully explore this compelling
theory of mitigation, leading the trial and appellate courts to lend little weight to
the evidence provided.

Reasonable strategic decisions cannot be made with a lack of information.
Counsel has a duty to investigate the facts in order "to preserve options" before
embarking on a course of mitigation. *Powell v. Collins*, 332 F.3d 376, 399-400 (6th
Cir. 2003). Counsel's failure to reasonably investigate, prepare and present this
mitigating evidence cannot be viewed as a reasonable strategic decision, but rather

must be viewed as a dereliction of duty that prejudiced Davis. *See Wiggins*, 539

U.S. at 525 (stating that a *Strickland* violation is established where the scope of an

attorney's investigation into mitigating evidence prior to trial was "unreasonable in

light of what" counsel knew about their client).

The District Court also denied relief and a COA on the basis that there was

no "reasonable probability that the three-judge panel would hand down a different

result" had "the additional evidence been presented." (R. 64, PageID 10041.) To

the contrary, counsel's deficient performance precluded the sentencing panel from

considering and giving weight and effect to available, compelling mitigation

evidence in Davis's sentencing. Davis's post-conviction expert, Diane Menashe, an

experienced criminal defense attorney in Ohio, opined, "Demonstrative evidence

of Davis' accomplishments and his behavior while in prison would have been

important tangible evidence for the trier of fact. . . . Submitting a two-page

summary through Mr. Nowak was incomplete and unpersuasive, particularly when

other evidence existed." (2nd P.C. Ex. D, R. 4-46, PageID 6275-79.) Where this

evidence "was the basis for the Sixth Circuit's reversal of Davis' 1989 death

sentence," according to Diane Menashe, "[t]here is no legitimate reason for

defense counsel's failure to even attempt to locate these or any other witnesses

which may have had information regarding Davis's good behavior while

incarcerated on death row." *Id.*

Accordingly, reasonable jurists could find that, absent counsel's deficient performance, there is a reasonable probability that Davis would not have been sentenced to death.

### B. A certificate of appealability should be granted where reasonable jurists could find that the state court's decision was contrary to clearly established federal law.

The District Court denied relief and a COA on the basis that the state appellate court "discussed the breadth of evidence introduced and considered by the panel." (R. 64, PageID 10041, *citing Davis XIII*, 2013-Ohio-3878, at ¶¶ 16-18.) The District Court concluded that "the denial of the claim was neither factually nor legally unreasonable," as the state appellate court interpreted this court's prior decision as "merely" finding that "the three-judge panel erred by improperly precluding Davis from introducing *any evidence* of his good behavior while on death row" and not that it required the introduction of specific mitigating evidence. (*Id*. at PageID 10041-42, *citing Davis XIII*, 2013-Ohio-3878, at ¶ 20.)

The state court's decision, however, was contrary to clearly established federal law as determined by the United States Supreme Court. The Eighth Amendment requires the sentencer to consider the circumstances of the crime and the defendant's character, history, and background during the penalty phase of a capital trial. *Boyd v. California*, 494 U.S. 370, 377-78 (1990); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). The United States Supreme Court has provided specific

guidance with respect to reasonable professional assistance during the sentencing phase of a capital case. *Rompilla*, 545 U.S. at 381-90; *Wiggins*, 539 U.S. at 521-29; *Williams*, 529 U.S. at 395-97.

Defense counsel failed to introduce even all of the *Skipper* evidence proffered at his previous sentencing in 1989, not to mention any of the additional twenty years of similarly powerful evidence. There is no reasonable strategy that would include leaving out evidence that the federal court held was compelling enough to support a grant of habeas relief. *See Davis X*, 475 F.3d at 773. Therefore, counsel's failure cannot be viewed as a reasonable strategic decision, but rather viewed as a dereliction of duty that prejudiced Davis. *See Wiggins*, 539 U.S. at 525.

### C.    Conclusion

Davis should be granted a COA because a reasonable jurist could find that Davis "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), or agree that his constitutional right to effective assistance of counsel was violated when trial counsel failed to reasonably investigate and present mitigating *Skipper* evidence at his second resentencing.

**VI.   This Court Should Grant a COA on Davis's Claim That His Right to Effective Assistance of Counsel Was Violated when Trial Counsel Failed to Reasonably Investigate and Present Mitigation Evidence.**

The Fifth, Sixth, Eighth, and Fourteenth Amendments guarantee a capital defendant the right to the effective assistance of counsel. This right is denied when counsel's performance falls below an objective standard of reasonableness as measured by the prevailing professional norms at the time, and the client is prejudiced by counsel's breach of that duty. *Padilla v. Kentucky*, 559 U.S. 356, 367-69 (2010); *Porter v. McCollum*, 558 U.S. 30, 38-39 (2009) (per curiam); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000); *Strickland v. Washington*, 466 U.S. 668, 686-88 (1984).

Counsel's deficient performance, when considered individually and cumulatively, denied Davis the effective assistance of counsel at sentencing. First, counsel harmed Davis by (a) telling the Court that Davis would never be paroled, then presenting contradictory testimony from Ohio Parole Board Chairperson Cynthia Mausser that he could be paroled, and (b) presenting damaging testimony from Dr. Robert Smith that Davis could be prone to "unwarranted aggressive behavior" based on minor provocation. Second, counsel failed to present significant mitigating evidence about Davis' life history as mitigating evidence, including: (a) failing to present significant mitigating life history evidence through Mitigation Investigator John Lee, who could have presented evidence obtained

43

from Elizabeth Crawford and Fannie Whiteside (Davis' paternal aunt and maternal aunt), and Dr. Charles Flowers and Milton Flowers (Davis' neighbors); and (b) failing to have the mitigation witnesses who testified explain in detail the trauma endured by Davis as a child. Trial counsel's presentation of such witnesses was truncated and inadequate, and didn't give the sentencing panel a true understanding of how Davis was traumatized by his father's alcoholism and abuse, parental neglect, and family instability.

Petitioners in this circuit routinely receive certificates of appealability on similar claims that counsel failed to conduct an adequate investigation and presented insufficient mitigating evidence at sentencing, including that they failed to prepare mitigation witnesses. *See, e.g. Coleman v. Bradshaw*, 974 F.3d 710, 716 (6th Cir. 2020) (COA granted on whether trial counsel rendered ineffective assistance during the penalty phase of the trial, including failure to prepare sole mitigation witness for his testimony or present additional family witnesses); *Caudill v. Conover*, 881 F.3d 454, 457 (6th Cir. 2018) (granting COA on whether lawyers provided ineffective assistance by choosing not to call additional witnesses during the penalty phase); *Van Tran v. Colson*, 764 F.3d 594, 603-04 (6th Cir. 2014); *Foust v. Houk*, 655 F.3d 524, 533 (6th Cir. 2011); *Landrum v. Mitchell*, 625 F.3d 905, 931 (6th Cir. 2010) (COA granted on claim that petitioner received ineffective assistance of counsel in the mitigation phase,

including that counsel failed to prepare witnesses who testified on petitioner's behalf and failed to contact other witnesses who were willing to testify); *Gabrion v. United States*, No. 18-2382, 820 Fed. App'x. 442, 443 (6th Cir. Sept. 10, 2020); *Sutton v. Carpenter*, No. 11-6180, 617 Fed. App'x. 434, 435 (6th Cir. June 23, 2015) (ineffective-assistance claim regarding counsel's failure to investigate and present additional social-history evidence pertaining to abusive childhood). This Court granted a COA for an ineffective assistance claim that counsel failed to investigate and present evidence of petitioner's troubled childhood and brain damage during the penalty phase, even though—unlike in this case—the petitioner had expressly requested not to present a mitigation case. *Zagorski v. Bell*, No. 06-5532, 326 Fed. App'x. 336, 338, (6th Cir. Apr. 15, 2009).

As the Southern District of Ohio has noted, "given the undeniable importance in death penalty cases of mitigation investigation and preparation and the wealth of federal case law addressing the same, this Court is of the view that counsel's preparation concerning the witnesses charged with persuading the jury to spare the petitioner's life deserves particular attention." *Jackson v. Bradshaw*, No. 2:03-cv-983, 2008 WL 926572, at *10 (S.D. Ohio Apr. 3, 2008) (granting COA on claim of ineffective assistance of counsel for failing to adequately prepare mitigation witnesses). Accordingly, Davis should receive a COA on this claim.

**A.    Davis was denied effective assistance of counsel when counsel called Cynthia Mausser as a mitigating witness and failed to adequately investigate and present Dr. Robert Smith's mitigating evidence.**

At Davis's second resentencing hearing, his counsel called Cynthia Mausser, then- chairperson of the Ohio Parole Board, to testify. During opening statements, counsel promised the court that "Ms. Mausser's testimony" will demonstrate that Davis "will never be paroled." (2nd Resent. Tr., Sept. 8, 2009, R. 5-7, PageID 8227.) The prosecutor responded that he had spoken to Ms. Mausser prior to the trial and that she would not, in fact, testify as counsel expected. (*Id.* at PageID 8323.) Counsel replied, "[W]e will be in a position of surprise and affirmative damage if she testifies as the prosecution is suggesting because we, in fact, interviewed her four months ago and . . . that that is not what we were told." (*Id.* at PageID 8327.) Ultimately, Ms. Mausser did not testify as counsel had anticipated, and she indicated by affidavit that she had not told counsel that she would make such statements. (2nd P.C. Ex. F, R. 4-46, PageID 6365.)

The District Court denied relief and a COA on the basis that defense counsel's actions were "within the broad ambit of reasonable trial strategy" to address the fact that Davis could not be sentenced to life without parole if not sentenced to death. (R. 64, PageID 10045.)

While the reasonableness of the strategy may be debatable, counsel's implementation was clearly unreasonable. The District Court questioned "how else

46

counsel could have countered the State's strategy than with Mausser's testimony," (R. 64, PageID 10045), but the reasonable strategy would have been simply *not* to present it. After all, Davis had instructed defense counsel not to present this testimony in his case. (2nd P.C. Ex. B, Aff. of Von Clark Davis, R. 4-46, PageID 6271; 2nd P.C. Ex. H, Redacted Mitigation Write-Up, July 7, 2009, R. 4-46, PageID 6379.) His attorneys ignored his request.

Without Ms. Mausser's testimony at his first resentencing, the Ohio Supreme Court had previously given "some weight in mitigation" to "the probability that appellant would never be released from prison if he were to be sentenced to life imprisonment." *State v. Davis* (*Davis IV*), 584 N.E.2d 1192, 1195 (Ohio 1992). In contrast, after the second resentencing panel heard Ms. Mausser's testimony, it found her testimony "highly speculative and unconvincing" and gave no mitigating weight to the probability that Davis would never be released from prison if given a sentence less than death. (2nd Resent. Op., Sept. 21, 2009, R. 4-39, PageID 4933.) Similarly, the panel gave "little weight" to Davis's "good behavior while in prison[.]" (*Id.*) Providing Ms. Mausser's testimony did nothing to improve Davis's mitigation argument; to the contrary, it affirmatively prejudiced him.

Regardless of the wisdom of putting Ms. Mausser on the stand in general, there should be no question that it was deficient performance for counsel to

47

promise testimony it could not deliver, even after being warned by the prosecutor that such testimony would not be forthcoming. As noted above, Davis's defense counsel promised the trial court that Ms. Mausser would testify that Davis "will never be paroled." (2nd Resent. Tr., Sept. 8, 2009, R. 5-7, PageID 8227.) Even after the prosecutor informed the court that he spoke with Ms. Mausser, who denied that she would provide such testimony, defense counsel insisted that she testify anyway. (*Id.* at PageID 8323, 8327.) Ms. Mausser's affidavit indicates that contrary to the record made by defense counsel, she did not agree to testify that Davis would never be paroled. (2nd P.C. Ex. F, R. 4-46, PageID 6365.) Davis's post-conviction expert, Diane Menashe, an experienced criminal defense attorney in Ohio, stated that promising the panel a witness who could guarantee no parole when no such witness existed was harmful to Davis and constitutes ineffective assistance of counsel. (2nd P.C. Ex. D, R. 4-46, PageID 6277.)

In addition, defense counsel failed to adequately prepare Ms. Mausser for her testimony. She would have been able to give a better opinion if she had the proper materials provided to her, but defense counsel did not provide her what she needed. (2nd P.C. Ex. F, R. 4-46, PageID 6366 (stating that access to Davis's entire file, which defense counsel failed to provide, "would be necessary for me to give any opinion on whether I would likely vote to parole Davis at any upcoming parole hearing").) Despite the speculative and harmful nature of her testimony,

defense counsel had her testify anyway. Defense counsel also failed to have anyone testify that Ms. Mausser had made a prior inconsistent statement on this matter, even after representing to the court that they would do so. (2nd Resent. Tr., Sept. 8, 2009, R. 5-7, PageID 8327.)

Accordingly, counsel was ineffective for "fail[ing] to reasonably investigate and prepare for mitigation by calling . . . a mitigation witness without discussing her anticipated testimony" and for not following up after being provided actual notice that their understanding of the witness's anticipated testimony was inaccurate. (Pet., R. 6, PageID 8678.) Ms. Mausser's testimony greatly undermined counsel's mitigation strategy, which was based on convincing the panel that Davis would not be a danger to society if sentenced to life in prison rather than death. Because counsel called the witness without adequately interviewing her, they brought to the panel's attention that Davis could, in fact, be paroled. This testimony was especially damaging in context, when counsel planned to call additional witnesses to testify that Davis would not be dangerous in a structured setting such as prison. A substantial amount of counsel's strategy hinged on testimony that counsel should have known Ms. Mausser would be unable to give. Ms. Mausser's testimony served only to contradict counsel's opening statements and to provide the flawed basis to counsel's subsequent deficient mitigation strategy. Absent counsel's deficient performance, there is a reasonable probability

that the outcome of the trial would have been different and the three-judge panel would not have sentenced Davis to death.

This Court has previously expanded a COA to include petitioner's claim that his attorneys were ineffective for failing to fulfill promises made to the jury in opening statement, just like here. *Harrison v. Motley*, 478 F.3d 750, 754 (6th Cir. 2007). Due to lack of a reasonable investigation, counsel's actions were not the product of sound trial strategy. *Wiggins*, 539 U.S. at 523-24 (requiring counsel's investigation to "comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor") (quotation omitted) (emphasis in original). Rather, it was an unreasonable application of clearly established federal law to conclude that counsel failure to conduct a reasonable investigation is "the product of sound trial strategy." *Davis XIII*, 2013-Ohio-3878, ¶ 25.

Following counsel's failure to present the evidence they promised, counsel compounded their error by calling Dr. Robert Smith to the stand. Dr. Smith testified that someone in Davis's psychological condition could adapt to a structured environment such as prison, (2nd Resent. Tr., Sept. 10, 2009, R. 5-8, PageID 8419-48), and Davis does not object to such a characterization. Dr. Smith also testified, however, that such a person would be prone to "unwarranted aggressive behavior that comes about with minor provocation." (*Id.* at PageID

8451.) Further, Dr. Smith testified that Davis was still affected by chronic borderline personality disorder. (*Id.* at PageID 8453, 8468.) Dr. Smith's testimony did not mitigate any fears that the panel might have had after learning from Ms. Mausser's testimony that Davis could possibly be paroled.

The District Court denied relief and a COA on the basis that the panel judges could have interpreted Dr. Smith's testimony about borderline personality disorder as either "a continuing danger should he be released (as Davis argues)," or "as underscoring the severity of Davis's mental illness, a key factor in mitigation." (R. 64, PageID 10047-48 ("Simply because the strategy was unsuccessful does not render the representation constitutionally deficient.") (citing *Davis XIII,* 2013-Ohio-3878 at ¶¶ 24-25).)

As the District Court acknowledges that reasonable jurists could disagree, this Court should grant a COA. Reasonable jurists could find that counsel's deficient failure to adequately review the mitigating evidence prepared by Dr. Smith and unreasonable decision to call him left the panel with the impression that, due to Davis's borderline personality disorder, if Davis were ever released from prison, and no longer in a structured environment, he could kill again. (Pet., R. 6, PageID 8682-85.)

For a decision to present testimony to be reasonable, it must be made after undertaking a full investigation. *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir.

2000); *see also Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991) ("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them."). When calling an expert witness, counsel should know the expert's opinion on the ultimate issue and prepare accordingly. *Combs*, 204 F.3d at 288.

No sound trial strategy would involve calling one witness to say that the defendant was not precluded from parole and another witness to say that the client was still affected by psychological problems that made him prone to aggressive behavior. A reasonable investigation and preparation for mitigation would have shown such information to be harmful, and reasonable counsel would not have presented the testimony to the three-judge panel. To the extent counsel premised Davis's defense on his never being released, they deficiently failed to investigate and prepare Ms. Mausser for her testimony, allowing her to diminish that line of defense.

Counsel failed to have Dr. Smith address how Davis had changed over time and, even with borderline personality disorder, could adapt in society. Instead, they focused on his psychological state of mind in 1984, which left the panel with the

impression that he was and still is dangerous. Dr. Smith's affidavit states that, if counsel had discussed these topics with him and asked him pertinent questions at the hearing, he would have been able to provide beneficial, instead of harmful, information for Davis:

> Had I known parole was a concern and how Von Clark Davis would interact in society if released on parole, I could have testified that with time, maturity, and freedom from drugs and alcohol, someone with Borderline Personality Disorder will gain insight and develop coping skills that would enable him to adjust to living in the outside world. I would have been able to testify that Von at the present time is a different person than he was when he was admitted to ODRC in 1984. Having been in a structured setting for the past 27 years, Von has learned to accept external rules and expectations regarding his behavior. He has developed coping strategies to deal effectively with frustration, annoyance, disappointment, etc. He has learned to weigh the potential consequences of his decisions and actions.

(2nd P.C. Ex. I, R. 4-46, PageID 6382.) Dr. Smith also "could have explained that the parole process itself would provide Von with significant structure and guidelines that would assist him in successfully re-entering society." (*Id*.) Defense counsel's failure to adequately investigate and prepare Dr. Smith for his testimony, specifically, for the fact that parole was going to be a critical issue, is what rendered his testimony not just immaterial, but in fact prejudicial to the defense.

The District Court also held that "it is still unclear how his testimony prejudiced Davis" where the panel gave Dr. Smith's opinion "little weight." (R. 64,

PageID 10048.) To begin, trial counsel's failure to investigate and prepare for Dr. Smith's testimony allowed the trial court to give "little weight" to Dr. Smith's testimony about Davis's good behavior in prison, for the very reasons at issue here: "Ultimately, however, Dr. Smith failed to forecast Defendant's behavior or recommend a treatment plan, should he eventually be released from prison." (*See* 2nd Resent. Op., Sept. 21, 2009, R. 4-39, PageID 4931-33.) In addition, the decision to go forward with Dr. Smith's testimony, when the panel had been reminded of Davis's potential release, prejudiced Davis by including testimony on his need for structure to avoid "act[ing] out again." (2nd Resent. Tr., Sept. 10, 2009, R. 5-8, PageID 8453.) The panel noted in their sentencing opinion Dr. Smith's finding that "individuals with borderline personality disorder [such as Davis] function well in a highly structured environment such as prison[,]" leaving open the question of how he would behave if released. (2nd Resent. Op., Sept. 21, 2009, R. 4-39, PageID 4931-33.) There is a reasonable probability that, had counsel not brought the probability of Davis's eventual release and, particularly the chance of recidivism to the panel members' minds, the panel would not have found it necessary to sentence Davis to death.

Accordingly, reasonable jurists could find that Davis was prejudiced by his counsel's deficient performance.

**B.    Davis was denied effective assistance of counsel when counsel failed to call mitigation investigator John Lee and failed to effectively investigate and present mitigating evidence from Davis's family.**

After introducing witnesses who implied through damaging testimony that Davis could have the opportunity to reoffend in the future, counsel also failed to fully investigate and present witnesses who could have offered valuable mitigating evidence about Davis's past. Counsel failed to call mitigation investigator John Lee, who counsel had originally planned to have testify about Davis's background and family history. Counsel had prepared exhibits related to four unavailable witnesses: paternal aunt Elizabeth Crawford, neighbor Dr. Charles Flowers, neighbor Milton Flowers, and maternal great aunt Fannie Whiteside. Mr. Lee had interviewed these witnesses and therefore had a more complete understanding of the mitigating circumstances influencing Davis's life. (*See* 2nd Resent. Hrg. Ex. List, R. 4-39, PageID 4917.) Counsel never presented this evidence at the hearing.

The District Court denied relief and a COA on the basis that Davis does not identify "the unavailable mitigation witnesses or why they would have been prepared to testify as projected." (R. 64, PageID 10046-47 ("Such speculation falls well short of what is required under *Strickland*[.]").)

The witnesses—all of whom were unable to testify themselves—could have provided critical substantive information about Davis and his family upbringing, including about Davis's parents' alcoholism, violence and neglect, how Davis's

father abandoned his wife and children, how Davis was physically abused by his

mother and other relatives. (*See* 2nd P.C. Ex. F, G, H, I, R. 4-46, PageID 6394-

6402.) Ms. Crawford talked about Davis's father's extramarital relations, his

temper, his frequent fights with Davis's mother, his abandonment of the family,

and his alcoholism, including stealing from his employer during a drinking binge.

(2nd P.C. Ex. F, R. 4-46, PageID 6395-96.) Dr. Charles Flowers talked about

Davis's mother's "wild" nature, her temper and frequent fights with Davis's

father—mostly about his absence from the house—and how the children would see

them physically fight. (2nd P.C. Ex. G, R. 4-46, PageID 6397-98.) He also noted

that Davis's mother had "unresolved anger" that "resulted in numerous whippings

for Von." (*Id.*) Milton Flowers also talked about Davis's mother's "violent temper"

and "numerous fights," the poor quality of care for Davis, and Davis's deep

isolation as a child. (2nd P.C. Ex. H, R. 4-46, PageID 6400 (Davis "faced rejection

both at home and in the community. Von was really out there on his own while he

was growing up. He was not able to go home to talk to anyone.").) Ms. Whiteside

discussed how Davis's mother "ran around with several men" and may have

fathered her children with different men. (2nd P.C. Ex. I, R. 4-46, PageID 6402.)

The witnesses were unavailable because two were deceased and the other two were

incompetent. (2nd P.C., R. 4-46, PageID 6254; 2nd P.C. Ex. D-E, R. 4-46, PageID

6390-93 (affidavits from doctors stating that Ms. Crawford had dementia and Ms.

Whiteside had Alzheimer's disease, Senile Dementia, and significant memory loss).)

The information was not cumulative of other evidence and was necessary to give the panel a complete picture of Davis's family history. Defense counsel recognized its importance by having Mr. Lee prepared to testify and the exhibits marked for introduction into evidence. For reasons unknown, when it came time to introducing the exhibits, defense counsel withdrew all of the exhibits. (2nd Resent. Tr., Sept. 10, 2009, R. 5-8, PageID 8504.) This decision was sudden, and there is no evidence that it was the result of any reasonable investigation. As a result, this relevant and important mitigating evidence regarding Davis's family background was never presented to the trial court.

Davis's post-conviction expert, Diane Menashe, an experienced criminal defense attorney in Ohio, reviewed the exhibits and the trial record and opined that Davis was deprived of effective assistance when counsel failed to present known, available and relevant mitigating evidence at the second resentencing hearing. (*See* 2nd P.C. Ex. D, R. 4-46, PageID 6278.)

This failure was compounded by counsel's failure to adequately investigate and present the circumstances to which Davis's siblings, parents, and neighbors could have testified. (Pet., R. 6, PageID #8691-92.) In particular, counsel did not elicit testimony about familial abuse, the family's history of alcohol dependence,

Davis's parents' relationship problems, and Davis's childhood behavior issues from those witnesses. Those behavior issues included his violent temper and "violent outbursts in school" just like those his mother and grandmother had. (*See* 2nd P.C. Ex. H, R. 4-46, PageID 6400 ("At times when he was angry, the other kids would have to catch and hold him until he cooled down.").) The witnesses could have described how those factors affected Davis and his siblings. Although Davis's dysfunctional family history included an absent, abusive and alcoholic father, frequent separations and extramarital relationships by his parents, and ongoing repeated pregnancies by his mother, (2nd Resent. Hr'g., R. 5-8, PageID 8459-60), the panel found that "the separate testimony of Defendant's family and friends [did] not support Dr. Smith's conclusion that Defendant suffered an extreme and dysfunctional upbringing," (2nd Resent. Op., Sept. 21, 2009, R. 4-39, PageID 4933.)

The District Court denied relief and a COA on the basis that mitigation witnesses testified "to a wide variety of evidence regarding his good character in prison, mental health diagnoses, alcoholism, and dysfunctional upbringing, including but not limited to having an alcoholic, absentee father[.]" (R. 64, p. 28, PageID 10049, *citing* Report and Recommendations, R. 51, PageID 9623-30 (citations omitted).) In other words, the District Court characterized the claim as alleging that "evidence was not persuasive" or that "there was other evidence that

could have been presented[,]" which was "insufficient to rebut the heavy presumption of competent representation under *Strickland."* (*Id.*)

While a petitioner claiming ineffective assistance of counsel must overcome the "strong presumption" that counsel's actions were part of "sound trial strategy," *Strickland*, 466 U.S. at 689 (internal quotation marks omitted), this presumption is subject to challenge, especially where Counsel's ineffectiveness stems from a lack of investigation. *See, e.g.*, *Wiggins*, 539 U.S. at 524 (requiring counsel's investigation to "comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor") (emphasis in original) (quotation omitted). In particular, the U.S. Supreme Court has recognized that counsel in a capital case has an "obligation to conduct a thorough investigation of the defendant's background" to determine the availability of mitigating evidence. *Williams*, 529 U.S. at 396. Not only must counsel investigate all reasonably available mitigating evidence, but counsel must then use that evidence to "to counter the State's evidence of aggravated culpability with evidence in mitigation." *Rompilla*, 545 U.S. at 380-81. "Thus, to provide professionally competent assistance in Ohio capital cases, defense counsel must conduct a reasonably thorough investigation into all possible mitigation evidence that would present a sympathetic picture of the defendant's

family, social, and psychological background." *Jells v. Mitchell*, 538 F.3d 478,

495-96 (6th Cir. 2008).

Merely presenting some investigation does not absolve defense counsel of

their duty. "We certainly have never held that counsel's effort to present *some*

mitigation evidence should foreclose an inquiry into whether a facially deficient

mitigation investigation might have prejudiced the defendant." *Sears v. Upton*, 561

U.S. 945, 955 (2010) (emphasis in original). Indeed, "an unreasonably truncated

mitigation investigation is not cured simply because some steps were taken prior to

the penalty-phase hearing and because some evidence was placed before the jury."

*Johnson v. Bagley*, 544 F.3d 592, 602-03 (6th Cir. 2008) (citing *Rompilla*, 545

U.S. at 382-83 (holding an investigation objectively unreasonable even though the

attorneys spoke to the defendant, five family members, and three mental health

witnesses).) This Court has followed these decisions in *Dickerson v. Bagley*,

concluding that "a partial, but ultimately incomplete, mitigation investigation does

not satisfy *Strickland's* requirements" for effective counsel. 453 F.3d 690, 695 (6th

Cir. 2006) (overruled on other grounds).

In both *Wiggins* and this case, "counsel chose to abandon their investigation

at an unreasonable juncture": "Despite these well-defined norms, however, counsel

abandoned their investigation of petitioner's background after having acquired

only rudimentary knowledge of his history from a narrow set of sources." 539 U.S.

at 527, 524; *see also id.* at 527 ("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

Objectively reasonable performance and sound trial strategy would not include the decision to put on evidence undercutting Dr. Smith's testimony about dysfunction, especially when it did not follow reasonable investigation. Had counsel better investigated and prepared the witnesses who testified, their testimony would have been valuable for mitigation. Instead, as presented, it prejudiced Davis.

Counsel failed to adequately investigate Davis's dysfunctional family and therefore presented the panel with an incomplete and inaccurate picture of his family history, background and mental health symptoms. Exploring Davis's background by thoroughly interviewing his family and family friends could only have aided counsel's strategy of showing that Davis "was raised in a dysfunctional environment." (2nd Resent. Tr., Sept. 8, 2009, R. 5-7, PageID 8224.) However, defense counsel's investigation and presentation at mitigation failed to provide context for Davis's dysfunctional family life and instead painted a much different picture of his upbringing and family background.

Davis's dysfunctional family history included an absent, abusive and alcoholic father, frequent separations and extramarital relationships by his parents, and repeated pregnancies by his mother. (2nd Resent. Tr., Sept. 10, 2009, R. 5-8, PageID 8459-60.[3])  However, counsel failed to elicit details regarding Davis's father and his drinking, any familial abuse, or the impact of the parents' tumultuous relationship on Davis and his siblings. Despite knowing about Davis's alcohol dependence, counsel failed to investigate and present evidence regarding alcoholism in the family or Davis's personal alcohol use. Even though Davis presents with multiple symptoms of borderline personality disorder, counsel failed to investigate or elicit details from mitigation witnesses regarding Davis's behavior as child, adolescent, or adult.

---

[3] What appears to be the basis of the District Court's reference to mitigation testimony about Davis's "alcoholic, absentee father" (R. 64, p. 28, PageID 10049, *citing* R. 51, PageID 9623-30), is the following exchange with Alluster Tipton, Davis's mother:

Q.    Uh-huh, do you recall [Davis's father] to be a drinker?

A.    Yes.

Q.    Was that part of the problem in your marriage?

A.    Yes.

Q.    And the family life?

A.    Yes, it was.

(2nd Resent. Tr., R. 5-7, PageID 8311-12.) No reasonable counsel would consider these one-word answers, without any details or examples, to properly convey that Davis's father was abusive and alcoholic.

Defense counsel's failure to prepare the family for their mitigation testimony harmed Davis by negatively influencing the three-judge panel's perspective of his childhood and family life as well as Dr. Smith's diagnoses. The panel used defense counsel's cursory mitigation presentation against Davis when finding that "the separate testimony of Defendant's family and friends does not support Dr. Smith's conclusion that Defendant suffered an extreme and dysfunctional upbringing." (2nd Resent. Op., Sept. 21, 2009, R. 4-39, PageID 4933.) By failing to adequately investigate witnesses for mitigation, defense counsel presented multiple witnesses who contradicted known facts from previous and current psychological evaluations and reports that demonstrated a complex and dysfunctional family history.

As reasonable jurists could find that counsel's failure to present available and known mitigating evidence regarding Davis's family history, character, and background, and failure to investigate and develop relevant mitigation testimony constituted ineffective assistance of counsel, this Court should grant him a COA.

## C.    Conclusion

Davis should be granted a COA because a reasonable jurist could find that he "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), or agree that his constitutional right to effective assistance of counsel was violated when counsel failed to adequately investigate, prepare for and present mitigation, to Davis's prejudice.

**VII. This Court Should Grant Davis a COA on His Claim that Trial Counsel Ineffectively Failed to Move to Recuse Judge Nastoff.**

This Court should also expand the certificate of appealability to include Claim 8, in which Davis asserts that, in violation of the Sixth and Fourteenth Amendments, resentencing counsel ineffectively failed to move to recuse Judge Nastoff from deciding his fate. *See e.g., McKernan v. Superintendent Smithfield Sci*, 849 F.3d 557, 563 (3d Cir. 2017) (court of appeals expanded certificate of appealability to include claim that trial counsel ineffectively failed to recuse trial judge and afterwards granted habeas corpus relief); *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (district court granted COA on claim that trial counsel ineffectively failed to recuse trial judge).

There were various reasons why Judge Nastoff should have been recused from sentencing Davis. First, and more generally, Judge Nastoff "was a former prosecutor who litigated capital cases," which meant that "he was not likely to favor the defense presentation." (2nd P.C. Ex. D, Aff. of Diane Menashe, Esq., R. 4-46, PageID 6279.) This alone provided reasonable grounds for seeking his recusal.

Second, and even more importantly, Judge Nastoff had, as a prosecutor, sought the death penalty against Davis' nephew Lahray Thompson. "During that prosecution," Judge Nastoff "heard and cross examined some of the very same mitigation evidence that Davis presented in his case. It would be difficult, if not

64

impossible, to put aside Judge Nastoff's prior opinions about the veracity and strength of the mitigation." (*Id.*) Notably, when capitally prosecuting Lahray Thompson, Nastoff pointedly argued to the jury that Davis' nephew was a liar, and he personally argued for the jury to impose the death sentence -- though the jury rejected his argument and returned a sentence of life imprisonment. (*See* 2nd P.C. Ex. M, *State v. Lahray Thompson*, Butler Co. Court of Common Pleas, No. CR95-12-1111, R. 4-46, PageID 6403-50 (Nastoff seeking the death penalty against Davis' nephew); Ex. N, *State v. Thompson*, Trial Tr. 1206-07, R. 4-46, PageID 6457-58); *State v. Thompson*, 1997 Ohio App. LEXIS 4659 (12th Dist. Oct. 20, 1997) (affirming conviction for aggravated murder).

Significantly, at Davis' resentencing hearing, Davis presented testimony from his sister Carol Smith seeking mercy for Davis. Carol Smith is Lahray Thompson's mother. (*See* 2nd Resent. Tr. 122-30, R. 5-7, PageID 8312-20.) Given Judge Nastoff's prior attempt to seek the execution of Smith's son, he was predisposed to reject Carol Smith's testimony when she now testified for Davis. Not surprisingly, Judge Nastoff and the sentencing panel wholly rejected the testimony of Davis' "friends and family concerning his dysfunctional family and childhood experiences" as being "unconvincing and entitled to little or no weight" (2nd Resent. Op. at 9, R. 4-39, PageID 4932), the same way Nastoff previously

65

argued, as a prosecutor, that another member of Davis' family was a liar and unworthy of belief.

Suffice it to say, there were grounds upon which trial counsel could have, and should have, sought Judge Nastoff's recusal. Under Ohio law, a judge should recuse if there is a "basis to reasonably question the judge's impartiality" or if recusal is otherwise "necessary to protect the rights of litigants or preserve public confidence in the judiciary." *In re Padden*, 155 Ohio St.3d 1218, 1219 (Ohio 2018). In Ohio, "[a]n appearance of bias can be just as damaging to public confidence as actual bias," and thus, "[a] judge should step aside or be removed if a reasonable and objective observer would harbor serious doubts about the judge's impartiality." *In re Murphy*, 110 Ohio St.3d 1206, 1207-08 (Ohio 2005) (citing Canon 3(E)(1) of the Code of Judicial Conduct) ("A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned.").

Where Judge Nastoff had previously prosecuted and argued for the death penalty against Davis' family member—whose own mother then testified for Davis—trial counsel could have moved to recuse Judge Nastoff in order to "[preserve] public confidence in the judiciary." *Id.* at 1207-08. At a minimum, given Nastoff's prior dealings with Davis' family, there was an "appearance of bias" against Davis and Davis' mitigation witnesses, a bias that was ultimately was

borne out in Judge Nastoff's sentencing decision, which rejected the testimony of Carol Davis and Davis' family and friends. *Id.* at 1208. (*See e.g.*, 2nd P.C. Ex. D, Aff. of Diane Menashe, Esq., R. 4-46, PageID 6279.)

Further, under the due process clause of the Fourteenth Amendment, Davis was entitled to the "assurance that the arbiter is not predisposed to find against him." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). As a matter of due process, therefore, a former prosecutor may not act as a judge in the same case which s/he prosecuted, because it would allow the judge to uphold or otherwise validate his or her prior actions. Under such circumstances, a judge could "be influenced by an improper, if inadvertent, motive to validate and preserve the results obtained through the adversary process." *Williams v. Pennsylvania*, 136 S.Ct. 1899, 1907 (2016).

To be sure, this was not the same case as the Lahray Thompson case prosecuted by Judge Nastoff, but given the overlap of issues between that prosecution and the sentencing of Von Clark Davis, *Williams* supports the conclusion that Judge Nastoff should have been recused. Having earlier been foiled in his attempt to secure the death sentence against Davis' nephew, Judge Nastoff may have been "influenced by an improper, if inadvertent, motive to validate" his prior actions by imposing the death sentence upon Davis. *Williams*, 136 S.Ct. at 1907. In other words, by now imposing the death sentence upon Davis, Judge

Nastoff was able (as a psychological matter) to validate and vindicate his prior, unsuccessful attempt to secure the death sentence against Davis' nephew.

Trial counsel, therefore, had more than sufficient grounds to seek Judge Nastoff's recusal under Ohio law and the due process clause, where it appears that Judge Nastoff was "predisposed to find against him," whether overtly or implicitly. *Marshall v. Jerrico, Inc.*, 446 U.S. at 242. Trial counsel, however, did not inform Davis that Judge Nastoff had capitally prosecuted his nephew and that this would undermine Nastoff's impartiality toward Davis, even though Davis himself would have wanted Nastoff recused, had he known about Nastoff's capital prosecution of his nephew. (*See* 2nd P.C. Ex. B, Aff. of Von Clark Davis, ¶8, R. 4-46, PageID 6271.) Instead, trial counsel unilaterally decided not to seek Judge Nastoff's recusal. (2nd Resent. Tr. 132, R. 5-7, PageID 8322.)

The Ohio Court of Appeals concluded that trial counsel was not ineffective because counsel was aware of Judge Nastoff's prosecution of Davis' nephew, but chose not to seek his recusal. *State v. Davis*, 2013-Ohio-3878, ¶26 (12th Dist. Sept. 9, 2013). Under the circumstances, that conclusion was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). *See McKernan v. Superintendent*, 849 F.3d 557, 564 (3d Cir. 2017) (state court decision denying ineffectiveness claim for failing to recuse trial judge was an unreasonable application of *Strickland*). Counsel's simple awareness of a different course of

action is not sufficient to defeat a claim of ineffectiveness where, as here, it is at least debatable whether counsel's performance fell below prevailing professional norms, to Davis's prejudice. A COA is appropriate.

Indeed, the state court decision was unreasonable because the state court of appeals failed to acknowledge, as noted in *Williams*, that Judge Nastoff still had an "improper, if inadvertent, motive" to sentence Davis to death, namely, to vindicate his prior, unsuccessful attempt to impose the death sentence upon Davis' nephew. 136 S. Ct. 1899, 1907. Under these unique circumstances, any reasonable attorney should have "harbor[ed] serious doubts about the judge's impartiality" and moved to recuse. *In re Murphy*, 110 Ohio St.3d at 1207-08.

It is thus debatable whether trial counsel denied Davis the effective assistance of counsel by failing to inform Davis about grounds for recusing Judge Nastoff, and by failing to move to recuse the judge despite his bias or appearance of bias against Davis and his family. This Court, therefore, should expand the certificate of appealability to include Claim 8, just as the Third Circuit granted an expanded certificate of appealability in *McKernan v. Superintendent Smithfield Sci*, 849 F.3d at 563, after which the court of appeals granted relief by concluding that counsel ineffectively failed to seek recusal of the trial judge. *See also United States v. Brown*, 369 Fed. Appx. 935, 937 (10th Cir. 2010) (court of appeals granted certificate of appealability regarding trial counsel's failure to recuse trial judge);

*Tai-Nan v. Wilson*, 336 Fed. Appx. 256, 259 (3d Cir. 2009) (same); *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (district court granted COA on claim that trial counsel ineffectively failed to recuse trial judge); *Welch v. Sirmons*, 451 F.3d 675, 682, 707 (10th Cir. 2006) (same); *Kilkeary v. United States*, 722 Fed. Appx. 207, 210, 211-12 (3d Cir. 2018) (same).

**VIII.  This Court Should Grant Davis a COA on His Claim that Trial Counsel Ineffectively Failed to Investigate and Present Mitigating Evidence About The Circumstances of Davis' Prior Conviction.**

As the United States Supreme Court emphasized in *Rompilla v. Beard*, 545 U.S. 374 (2005), when it is clear that the prosecution in a capital case will rely upon a defendant's prior criminal offense as aggravating evidence, defense counsel have a Sixth Amendment "duty to make all reasonable efforts to learn what they could about the offense." *Id*. at 385. Counsel must investigate a defendant's prior conviction not only "to learn the details . . . of the earlier crime," but to identify "any mitigating evidence" surrounding that offense, including any "circumstances extenuating the" defendant's actions. *Id*. at 385-86. *See Ex Parte Langley*, 833 S.W.2d 141, 143 (Tex. Crim. App. 1992) (granting relief for failure to investigate prior conviction after recognizing that "Counsel has a duty to make a proper investigation and prepare for trial," and "[t]his duty includes investigating a defendant's prior convictions") (citing *Ex parte Dunham*, 650 S.W.2d 825 (Tex.Cr.App. 1983) and *Ex parte Poole*, 738 S.W.2d 285 (Tex. Crim. App. 1987)).

As in *Rompilla*, the Supreme Court and the lower courts have concluded that trial counsel performs deficiently by failing to properly and fully "investigate the State's aggravating evidence," such as the circumstances of a defendant's prior conviction. *Andrus v. Texas*, 140 S.Ct. 1875, 1881-82 (2020) (trial counsel deficiently failed to investigate "the State's aggravating evidence"); *United States v. Kissick*, 69 F.3d 1048, 1056 (10th Cir. 1995) (counsel performed deficiently in failing to investigate nature of prior conviction used to enhance defendant's sentence); *Tucker v. State*, 395 P.3d 1 (Okla. Crim. App. 2016) (same). Similarly, as in *Rompilla*, courts have concluded that trial counsel's failure to investigate a prior conviction requires resentencing when trial counsel's failures are prejudicial. *See*, *e.g.*, *Green v. State*, 975 So.2d 1090 (Fla. 2008) (trial counsel ineffective and petitioner granted new capital sentencing hearing where counsel failed to investigate nature of petitioner's prior conviction that would not have qualified as aggravating circumstance under state law).

Here, there was no question that Davis' prior conviction for the murder of Ernestine Davis was always going to be an issue at sentencing. In fact, this prior conviction was the only aggravating circumstance before the sentencing panel, where the prosecution relied on this conviction to establish that Davis had been "convicted of an offense an essential element of which was the purposeful killing

of or attempt to kill another," under Ohio Rev. Code §2929.04(A)(5).[4] (*See* 2nd

Resent. Tr. at 7, 32-33, 39, R. 5-7, PageID 8196, 8221-22, 8228 (April 20, 1971

conviction for second-degree murder).) And ultimately, the sentencing panel

imposed the death sentence by placing "great weight" on this lone aggravating

circumstance:

> The aggravating circumstance in this case relates that prior
> to committing the aggravated murder of Suzette Butler
> with prior calculation and design, Defendant was
> previously convicted of purposefully killing Ernestine
> Davis. The three-judge panel unanimously finds that the
> aggravating circumstance deserves *great weight.*

(2nd Resent. Op. at 9, R. 4-39, PageID 4932 (emphasis added).)

Because this prior conviction was the sole aggravating circumstance to be

weighed at sentencing (*see* Ohio Rev. Code §2929.03(D)(2)), it was incumbent

upon defense counsel to present available mitigating evidence about the

circumstances of that offense to show that this prior conviction ought not be given

"great weight." (2nd Resent. Op. at 9, R. 4-39, PageID 4932.) (*See* 2nd Resent. Tr.

12, R. 5-7, PageID 8201 (Judge Pater explaining before sentencing hearing that

---

[4] At the time, Ohio Rev. Code §2901.05 provided: "No person shall purposely and maliciously kill another. Whoever violates this section . . . is guilty of murder in the second degree . . . ." *See State v. Keith*, 2020 Ohio Misc. Lexis 123 (Cuyahoga Cty. Ct. of Com. Pleas, Aug. 18, 2020). "The purposeful killing of another was an essential element of second-degree murder under former R.C. 2901.05." *State v. Davis*, 139 Ohio St.3d 122, 141 (2014).

"the statute says that we are to hear testimony and evidence concerning the nature and circumstances of that aggravating offense.")); *See also* Ohio Rev. Code §2929.03(D)(1) (sentencer shall "hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing").

Trial counsel, however, failed to conduct a full "investigation of the State's case in aggravation," and their performance was thus constitutionally deficient. *Andrus v. Texas*, 140 S.Ct. at 1884; *Rompilla*, 545 U.S. at 385-86. Yet had counsel effectively investigated and evaluated the circumstances of Davis' prior conviction, they could have easily convinced the sentencing panel to place little weight on that conviction and to impose a life sentence. This is because they would have learned, and could have presented, the facts that Ernestine had threatened to kill Davis, and she had provoked him by attacking him with the knife that was later used to stab her.

Robert Beard has explained the circumstances surrounding the death of Ernestine, which could have been presented at Davis' sentencing hearing. (*See* 1st P.C. Ex. CC, Ltr. of Robert Beard, R. 4-19, PageID 2028-29.) In a letter to Davis' attorney, Beard has set forth the circumstances surrounding Ernestine's death, which prove that her death was highly mitigated, the result of a heated dispute in

73

which Ernestine was the aggressor who attempted to kill Davis by attacking him

with a knife:

> When Von came that day of the murder, Ernestine and I was upstairs. [H]e arrived at the back door and she asked who was it, and he told her. She cursed to me about being tired of that bastard and would stick him. She withdrew a large knife from under the mattress and swore she would use it. It wasn't my business so I stayed out of it. They were arguing in the kitchen and when it became very loud, I decided to leave coming down the stairs. I remember him asking her why did she have a knife and then heard wrestling. To be honest with you, Ernestine was the aggressor and not Von, he was trying to talk to her. I couldn't see much more, only heard Ernestine yelling that she would kill him. I went back upstairs to comfort the children.
>
> It is my understanding that Von was to[o] confused to tell the true facts, and I can't understand why you couldn't detect this. I know it wasn't premeditation because he did not have a knife with him, the knife that killed Ernestine was the knife she withdrew from the mattress, because I saw it. I don't know if this is going to help Von now, but I must relay this confession on to his family so they will know the truth. . . . I must help him, God knows it was not his fault.
>
> Concern,
> Robert (Jones) Beard

(*Id.*)

With such evidence from Beard, trial counsel initially could have argued that

Davis' prior conviction ought not be considered a qualifying aggravating

circumstance under Ohio Rev. Code §2929.04(A)(5), which requires a

74

"purposeful" killing (or attempted killing). Indeed, the Ohio Supreme Court held in *State v. Rhodes*, 63 Ohio St.3d 613 (1992), that a defendant may be convicted only of involuntary manslaughter if the evidence demonstrates that "he or she acted under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant to use deadly force. . . ." *Id*. at 620. Consequently, trial counsel could have argued that the conviction was inadmissible under §2929.04(A)(5). Admittedly, because Davis pleaded guilty to second-degree murder and one of the elements of that offense was a purposeful killing, *see State v. Davis*, 139 Ohio St.3d at 141, that would have been a challenging argument.

Even so, by presenting testimony and evidence about the circumstances of the prior offense from Beard, trial counsel could have avoided the death sentence by effectively convincing the sentencing panel not to place "great weight" on the prior conviction. Assuming Davis' second-degree murder conviction qualified as an aggravating circumstance under Ohio Rev. Code §2929.04(A)(5), trial counsel could have easily shown that the offense was a highly mitigated offense that should be given little weight in favor of death.

With proof from Beard, trial counsel could have established that, in reality, Davis' stabbing of Ernestine was akin to voluntary manslaughter, such that it should have been given little weight in support of the death penalty. Rather than

being worthy of the most significant weight that the panel assigned to the offense—"great weight"—it should have been given only minimal weight at best, given Ernestine's provocation and Davis' resulting "sudden passion" or "sudden fit of rage" toward her. *Rhodes*, 63 Ohio St.3d at 620; *compare State v. Osie*, 2010 Ohio Misc. Lexis 14111, *8, Butler Cty. Ct. of Com. Pleas (assigning increasing gradations of weight to aggravating circumstances of "no weight, some weight, moderate weight, considerable weight, substantial weight, and great weight.").

Consequently, had counsel presented proof of the circumstances of the prior conviction, there is a reasonable probability that the sentencing panel would have accorded this sole aggravating circumstance much less weight (such as "some weight," or "moderate weight" at most), and instead imposed a life sentence, given the lesser weight that would have been assigned to the prior conviction. *Compare Commonwealth v. Smith*, 131 A.3d 467 (Pa. 2015) (capital sentencing jury struggled to reach unanimous verdict when considering defendant's prior conviction of involuntary manslaughter as sole aggravating circumstance).

The District Court's reasons for denying a COA on this ground were misplaced. Initially, the Magistrate Judge insisted that Beard's letter "could not, by itself, have overcome the uncontested finding that Davis had purposely killed Ernestine." (Report & Recommendation, R. 51, PageID 9679.) That, however, was the wrong inquiry. To secure relief on Claim 16, Davis did not have to fully

76

"overcome" the existence of a prior purposeful killing: He needed only to have the sentencer accord the prior conviction lesser weight, which, as he has just shown, could have been achieved had counsel investigated and presented evidence of the circumstances surrounding Ernestine's death.

The District Judge later concluded that Davis was not prejudiced by counsel's failures because there "was no constitutional error in the underlying conviction." (Order, R. 64, PageID 10067-68.) Here again the District Judge erred because she did not consider that, had counsel performed effectively, the *weight* assigned to the prior conviction would have been significantly less, leading to a life sentence.

It is thus debatable whether Davis is entitled to relief on Claim 16, and this Court should expand the certificate of appealability, given trial counsel's failure to investigate and present to the sentencer the "circumstances extenuating" Davis' fatal encounter with Ernestine. *Rompilla*, 545 U.S. at 386. In fact, in the Eleventh Circuit, capital petitioners have routinely been granted COAs when alleging that counsel ineffectively failed to investigate and present mitigating circumstances surrounding a petitioner's prior conviction. *See Davis v. Commissioner*, 2019 U.S. App. Lexis 17039 *5-6 (11th Cir. 2019) (in capital case, granting COA on question whether trial counsel ineffectively failed to investigate and present mitigating evidence surrounding petitioner's prior robbery conviction used as aggravating

circumstance in support of death sentence); *Daniel v. Commissioner*, 822 F.3d 1248, 1270-80 (11th Cir. 2016) (district court granted certificate of appealability, and court of appeals later remanded for evidentiary hearing, on capital habeas petitioner's claim that trial counsel ineffectively failed to investigate and present evidence of circumstances surrounding petitioner's prior conviction).[5]

## IX.    Conclusion

For the foregoing reasons, Petitioner Davis respectfully requests this Court expand his certificate of appealability to include these additional six grounds for relief.

Respectfully submitted,

**Deborah L. Williams**
Federal Public Defender

by

---

[5] As Judge Graham held in earlier proceedings in this case, this ineffectiveness claim could not be procedurally defaulted as *res judicata* on direct appeal, because it relies on evidence from Beard that was not contained in the trial court record. Thus, it could only have been presented for the first time in a post-conviction proceeding. (District Court Order, R. 16-1, PageID 8934.) Under the circumstances, therefore, the Ohio Court of Appeals' statement that this claim was "otherwise barred by *res judicata*" (*State v. Davis*, 2013-Ohio-3878, ¶40 (12th Dist. Sept. 9, 2013)) cannot, and does not, provide a valid procedural default. *See White v. Mitchell*, 431 F.3d 517, 526-27 (6th Cir. 2005) (state court's invocation of *res judicata* in post-conviction proceedings did not bar federal review where claim could not have been presented on direct appeal absent additional evidence not contained in trial court record); *Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005); *Schwieterman v. Smith*, 612 Fed. Appx. 825, 828 (6th Cir. 2015).

*/s/ Erin G. Barnhart*
**Erin G. Barnhart (0079681)**
*Trial attorney*
**Jordan S. Berman (0093075)**
*Co-counsel*
Assistant Federal Public Defenders
Federal Public Defender's Office
for the Southern District of Ohio
Capital Habeas Unit
10 W. Broad Street, Suite 1020
Columbus, Ohio 43215
Phone: (614) 469-4141
erin_barnhart@fd.org
jordan_berman@fd.org
**Counsel for Petitioner**

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2021, I electronically filed the foregoing

**PETITIONER-APPELLANT VON CLARK DAVIS'S MOTION FOR AN**

**EXPANDED CERTIFICATE OF APPEALABILITY** with the Clerk of the

United States Court of Appeals for the Sixth Circuit using the CM/ECF system,

which will send notification of such filing to the email address of opposing counsel

on file with the Court.


*/s/ Erin G. Barnhart*
**Erin G. Barnhart (0079681)**
Assistant Federal Public Defender
Counsel for Petitioner