No. 21-3404

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| VON CLARK DAVIS, | : | On Appeal from the |
| Appellant, | : | United States District Court |
| v. | : | for the Southern District of Ohio |
| | : | |
| CHARLOTTE JENKINS, | : | Case No. 2:16-cv-00495 |
| Appellee. | : | |
| | : | |

---

## APPELLEE'S PETITION FOR REHEARING *EN BANC*

---

DAVE YOST
Ohio Attorney General

MICHAEL J. HENDERSHOT*
Chief Deputy Solicitor General
 *Counsel of Record
JANA M. BOSCH
Deputy Solicitor General
STEPHEN E. MAHER
Senior Assistant Attorney General
Ohio Attorney General's Office
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
Michael.Hendershot@OhioAGO.gov

*Counsel for Appellee*
 *Charlotte Jenkins*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................ii

RULE 35(b) STATEMENT AND INTRODUCTION .......................................... 1

STATEMENT OF FACTS ................................................................................. 2

ARGUMENT........................................................................................................ 4

    I.      On the bench-trial-election claim, the panel avoided AEDPA deference by misreading the state court's decision and deviating from Supreme Court precedent. ....................................................................... 4

    II.    On the ineffective-failure-to-seek-recusal claim, the panel avoided AEDPA by misapplying *Strickland* and misconstruing the record. ........... 8

    III.   On the claim of ineffective assistance regarding mitigation strategy, the panel misapplied *Strickland* and ignored a relevant state-court decision............................................................................................... 14

CONCLUSION.................................................................................................. 18

CERTIFICATE OF COMPLIANCE................................................................. 19

CERTIFICATE OF SERVICE .........................................................................20

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Cassano v. Shoop*,
10 F.4th 695 (6th Cir. 2021) ...............................................................2

*Clemons v. Mississippi*,
494 U.S. 738 (1990) ........................................................................ 16

*Davis v. Coyle*,
475 F.3d 761 (6th Cir. 2007)...............................................................3

*Engle v. Isaac*,
456 U.S. 107 (1982)........................................................................ 12

*Fields v. Jordan*,
60 F.4th 1023 (6th Cir. 2023)..............................................................2

*Harrington v. Richter*,
562 U.S. 86 (2011) .................................................................. 1, 6, 9

*Hurst v. Florida*,
577 U.S. 92 (2016)............................................................................5

*Johnson v. Williams*,
568 U.S. 289 (2013) ...............................................................6, 7, 12

*Lundgren v. Mitchell*,
440 F.3d 754 (6th Cir. 2006) ............................................................ 16

*McKinney v. Arizona*,
140 S. Ct. 702 (2020) ........................................................................5

*Post v. Bradshaw*,
621 F.3d 406 (6th Cir. 2010) ............................................................ 16

*Premo v. Moore*,
562 U.S. 115 (2011) ...............................................................9, 10, 17

*Rogers v. Mays*,
69 F.4th 381 (6th Cir. 2023)................................................................2

*Shoop v. Cunningham,*
 143 S. Ct. 37 (2022) ............................................................ 12

*Shoop v. Twyford,*
 142 S. Ct. 2037 (2022) .......................................................... 1

*State v. Davis,*
 139 Ohio St. 3d 122 (2014) ..........................................*passim*

*State v. Davis,*
 143 Ohio St. 3d 1441 (2015) ................................................ 3

*State v. Davis,*
 2013-Ohio-3878 (Ct. App.) ............................................ 3, 17

*Strickland v. Washington,*
 466 U.S. 668 (1984) ........................................................*passim*

*United States v. Bayless,*
 201 F.3d 116 (2d Cir. 2000) ......................................... 12, 13

*Walker v. Martel,*
 709 F.3d 925 (9th Cir. 2013) ............................................. 10

*Ward v. Norris,*
 577 F.3d 925 (8th Cir. 2009) ............................................. 12

*Weaver v. Massachusetts,*
 582 U.S. 286 (2017) ............................................................ 14

*White v. Wheeler,*
 577 U.S. 73 (2015) ................................................................ 2

*White v. Woodall,*
 572 U.S. 415 (2014) ............................................................ 14

**Statutes, Rules, and Constitutional Provisions**

Fed. R. App. P. 35 ...................................................................... 2

Ohio Rev. Code §2929.03 ...................................................... 2, 5

Ohio Rev. Code §2929.06 ........................................................................3

Ohio Rev. Code §2945.05 ........................................................................8

Ohio Rev. Code §2945.06 ....................................................................2, 8

## Other Authorities

Sherrod Brown, *Official Roster: Federal, State, County Officers*, 1983-
1984 ........................................................................................................8

## RULE 35(b) STATEMENT AND INTRODUCTION

AEDPA demands that federal courts review state-court judgments charitably, not critically. Yet the Panel Opinion here wielded a hair-trigger red pen, not hands-off deference. And it did so repeatedly, evading AEDPA while granting relief on three distinct bases. What are the odds that Ohio's courts made three *unrelated errors* "so lacking in justification," so "well understood," as to place them "beyond any possibility for fairminded disagreement"? *Harrington v. Richter*, 562 U.S. 86, 103, (2011). Slim. The panel's decision discovering three distinct errors says far more about its analysis than about the quality of the Ohio decisions it annulled. The panel's triple-play abrogation of a capital sentence merits full-court review.

AEDPA reinvigorated the "principles of comity, finality, and federalism," *Shoop v. Twyford*, 142 S. Ct. 2037, 2043 (2022), in federal-court review of state-court convictions by requiring deference to the judgments upholding those convictions. That deference is especially important in capital cases, in which victims already wait decades for justice. When a federal court sets aside a capital judgment, the full court should assure those victims that federal law really does require the delay in final justice they are owed. Such intrusion into the state's interest in enforcing its criminal laws in decades-old capital cases is a question of exceptional im-

portance. Fed. R. App. P. 35(b)(1)(B); *see, e.g.*, *Rogers v. Mays*, 69 F.4th 381, 387 (6th Cir. 2023) (en banc); *Fields v. Jordan*, 60 F.4th 1023, 1024 (6th Cir. 2023) (order granting en-banc review).

The panel decision forces the State of Ohio to re-sentence—nearly four decades after the murder—a man convicted and sentenced to death for his second violent murder. The full court should step in to clean up its otherwise "sad record" in abiding AEDPA in capital cases. *Cassano v. Shoop*, 10 F.4th 695, 697 (6th Cir. 2021) (Griffin, J., dissenting from denial of rehearing en banc). This Court should not leave it to the Supreme Court to advise it yet "again … that the provisions of AEDPA apply with full force even when reviewing a conviction and sentence imposing the death penalty." *White v. Wheeler*, 577 U.S. 73, 81 (2015).

## STATEMENT OF FACTS

Onlookers watched in horror as Von Clark Davis shot Suzette Butler in the head at point-blank range. *State v. Davis*, 139 Ohio St. 3d 122, 123 (2014). Unsurprisingly, Davis faced poor prospects of acquittal at trial. Instead of facing a jury, he exercised his statutory election to be tried and sentenced by a three-judge panel. *Id.*; *see* Ohio Rev. Code §§2929.03(C)(2)(a)–(b), 2945.06 (1981). The panel convicted him and sentenced him to death. *Davis*, 139 Ohio St. 3d at 123.

On his first direct appeal, the Ohio Supreme Court affirmed the conviction but remanded for resentencing. *Id.* at 123–24. The panel again sentenced Davis to death, and the Ohio Supreme Court affirmed. *Id.* at 124. A panel of this Court ultimately granted habeas relief on the ground that Davis should have been allowed to present more mitigation evidence on remand. *Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007).

When Davis returned to state court for this third sentencing, all three judges from the original panel were unavailable. *Davis*, 139 Ohio St. 3d at 124. So, in keeping with Ohio statute, the court composed a new three-judge panel, which also sentenced Davis to death. *Id.*; Ohio Rev. Code §2929.06(B). Davis objected, arguing that his bench-trial election was too stale, and that enforcing it would violate due process. The State Courts rejected these arguments. *Davis*, 139 Ohio St. 3d at 129–30. Next, Davis sought postconviction relief, as relevant here, on the grounds that his counsel rendered ineffective assistance by deciding not to seek a judge's recusal and through decisions about which witnesses to call and how to question them during mitigation. *State v. Davis*, 2013-Ohio-3878 ¶¶24–25 (Ct. App.); *State v. Davis*, 143 Ohio St. 3d 1441 (2015). The Ohio courts denied relief.

Davis returned to federal court to seek habeas relief. After the district court denied the petition on all counts, a panel of this Court granted relief over Judge Gibbons's dissent.

The Warden now seeks full-court review.

## ARGUMENT

The panel majority granted relief on three grounds. For each ground, it discovered a reason that the Ohio court acted beyond the wide guardrails in which those courts could resolve Davis's claims. This case warrants the full court's review to preserve AEDPA's federalism-driven deference and the State's sovereign interest in punishing the guilty.

I.   **On the bench-trial-election claim, the panel avoided AEDPA deference by misreading the state court's decision and deviating from Supreme Court precedent.**

Davis claims Ohio violated his constitutional right to have a jury sentence him at the 2009 resentencing. The Panel agreed, holding that Ohio violated the Constitution when it "enforced" the bench-trial election against him at that hearing. Panel Op.12. The panel reached that result by misreading the Ohio Supreme Court's holding and breaking from the U.S. Supreme Court instructions about how to read the Ohio Supreme Court's judgment.

4

**A.** In addressing this claim, the Ohio Supreme Court noted that Davis had no right to a jury at his sentencing hearing because "neither the Sixth nor the Eighth Amendment creates a constitutional right to be *sentenced* by a jury, even in a capital case." *Davis*, 139 Ohio St. 3d at 130. The panel found that holding unreasonable and therefore deployed de-novo review, but only because it rewrote the Ohio Supreme Court's statement to read, "there is no constitutional right to *jury factfinding* in capital sentencing." Panel Op.11 (emphasis added). The Ohio Supreme Court never said that.

Unlike the panel's paraphrase, the Ohio Supreme Court's statement aligned perfectly with Supreme Court precedent. A jury must "find each fact necessary to impose a sentence of death." *Hurst v. Florida*, 577 U.S. 92, 94 (2016). After that, the Constitution does "not require jury weighing of aggravating and mitigating circumstances" to determine the ultimate sentence. *McKinney v. Arizona*, 140 S. Ct. 702, 708 (2020). In other words, *Hurst* and its predecessors have "nothing to do with jury sentencing," and "States that leave the ultimate life-or-death decision to the judge may continue to do so." *Id.* (quotation omitted). The Ohio Supreme Court never contradicted this precedent and had no reason to, as Ohio statutes have long required a jury to find—in the verdict forms—any fact that renders the defendant eligible for the death penalty. *See* Ohio Rev. Code §2929.03 (1981).

When the Ohio Supreme Court's treatment of the jury-right claim is viewed for what it really said, AEDPA plainly applies. Both when the Ohio Supreme Court ruled, and today, the Sixth Amendment is silent about whether a jury or a judge should make the ultimate decision about whether to impose the death penalty. The Ohio Supreme Court's judgment is not only right on this point, but indisputably right when evaluated through a lens looking only for errors "beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

**B.** The panel took another shot at stripping the Ohio Supreme Court of its due deference, but it fails as well. According to the panel, the Ohio Supreme Court "failed to discuss the constitutional implications of enforcing a waiver against Davis even though the state did not comply with the express language of the waiver." Slip Op. at 12.

Under AEDPA, state courts are free to address some arguments while regarding others as "too insubstantial to merit discussion." *Johnson v. Williams*, 568 U.S. 289, 299 (2013). When that happens, federal courts "must presume (subject to rebuttal) that the federal claim was adjudicated on the merits." *Id.* at 293. Davis did not—and could not—rebut this presumption. *See* Davis Br.40. The Ohio Supreme Court did not purport to address every argument in Davis's brief. It said, for example, that it evaluated "Davis's *principal* contention" regarding his claim

that a jury should have sentenced him in 2009. *Davis*, 139 Ohio St. 3d at 129 (emphasis added). The panel's insistence that the Ohio Supreme Court had to write a response to every twist and turn of Davis's argument would assume an authority that federal courts lack: they "have no authority to impose mandatory opinion-writing standards on state courts." *Johnson*, 568 U.S. at 300.

The panel raised just one justification for reviewing de novo any argument the Ohio Supreme Court did not expressly address: a Sixth Circuit case about unadjudicated *elements* of a claim, not about individual *arguments* supporting a claim. *See* Panel Op.12 (citing *Rayner v. Mills*, 685 F.3d 631, 639 (6th Cir. 2012)). Here, the Ohio Supreme Court had already concluded that the Constitution afforded Davis no right to a jury sentencing, and addressed what it considered Davis's main argument. The Ohio Supreme Court had no further obligation to show its work to prove that it had considered all other "constitutional implications" of the sentencing procedure. Panel Op.12. In short, the panel had no license to subject the Ohio Supreme Court's opinion to de-novo scrutiny.

And the Ohio Supreme Court's work stands up to further scrutiny anyway. The "constitutional implications" that troubled the panel derive from the composition of a sentencing panel in 2009 with different judges than the sentencing panel in 1984. As Davis saw it, he bargained for the specific judges who sentenced him in

1984—forever. But there is no reason to read Davis's bench-trial election as a bargain with anyone. He had the statutory right to pick trial by the bench rather than a jury, and the court had no discretion to refuse his choice. Ohio Rev. Code §2945.06. He also had the right to withdraw the election at any time before trial for any reason—hardly a feature of bargains in any context. Ohio Rev. Code §2945.05. As for the listed judges, the court did not sign the portion of the election that identified the judges by name. Instead, the judge signed only a statement that the court had "accepted" Davis's election. *See* Jury Waiver and Election of Three-Judge Panel, R.4-3, PageID#433. Even the election form naming the judges has no obvious significance: Judges Stitsinger, Bruewer, and Moser were the only judges in the general division of the Butler County Court of Common Pleas at the time. *See* Sherrod Brown, *Official Roster: Federal, State, County Officers*, 1983–1984, at 319. In context, the bench-trial election was just that—an election—not a bargain with the prosecutor or the court that entitled Davis to insist that he could switch back to jury sentencing—even decades later—if any judge who served in 1984 could no longer serve in 2009.

## II.  On the ineffective-failure-to-seek-recusal claim, the panel avoided AEDPA by misapplying *Strickland* and misconstruing the record.

Davis argued that his counsel provided ineffective assistance at the 2009 sentencing by not moving to recuse Judge Nastoff. The panel agreed, but its conclu-

sion rests on multiple legal errors that break from Supreme Court authority and an unsupported conclusion about the record. Each of those errors is necessary to the panel's awarding habeas relief.

**A.** The well-known test for ineffective assistance requires showing "both that … counsel provided deficient assistance and that there was prejudice as a result." *Richter*, 562 U.S. at 104. As to performance, courts view counsel's actions without "the distorting effects of hindsight," while "strong[ly] presum[ing] that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). As to prejudice, a claimant must show a "reasonable probability that," absent the deficient performance, the trial and appellate courts "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.

AEDPA, of course, makes this already deferential review "doubly so." *Richter*, 562 U.S. at 105 (quotations omitted). Viewed through AEDPA's lens, the "question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* One consequence of this double deference is that, when a defendant claims that his counsel should have filed a particular motion, the merits of the motion may not be "incorporated into" the ineffective-assistance claim. *Premo v. Moore*, 562 U.S. 115, 128 (2011). "The lesson of *Premo*,"

9

the Ninth Circuit explained, "is that *Strickland* bears its own distinct substantive standard for a constitutional violation; it does not merely borrow or incorporate other tests for constitutional error and prejudice." *Walker v. Martel*, 709 F.3d 925, 940 (9th Cir. 2013)

**B.** The panel committed an error just like the one corrected in *Premo*. Rather than explore whether the Ohio court unreasonably applied *Strickland*, the panel avoided AEDPA by faulting the Ohio court for not analyzing the "judicial-bias portion" of the *Strickland* claim—that is, it faulted the Ohio court for reviewing judicial-bias only through the lens of *Strickland*, not de novo. Panel Op.17. The panel then conducted that de-novo review itself. But just as *Premo* held that the underlying claim was not a "portion" of the ineffective-assistance claim there, the panel should not have proceeded as if judicial bias was a "portion" of the ineffective-assistance claim here. That legal error provided the only path for the panel to find unconstitutional bias.

Even so, on de-novo review, the panel's handling of bias misses the mark. The panel's theory runs like this: (1) when Judge Nastoff prosecuted Davis's nephew years before taking the bench, then-prosecutor Nastoff had "cross-examined" certain mitigation evidence, (2) Davis presented some of the same mitigation evidence before Judge Nastoff, (3) Judge Nastoff was likely unable to view

10

the evidence objectively because he was "psychologically wedded" to a skeptical view of that evidence. Panel Op.20. The problem is that neither the panel nor the parties ever pointed to any overlapping evidence. The only example Davis mustered in panel-stage briefing was his sister's testimony, but she did not testify at the nephew's trial. *See* Tr., R.5-7, PageID#8316; Davis Br.55.

Without this hole in the chain of reasoning, any claim of bias—and thus deficient performance—would fail. Supreme Court precedent has never recognized a risk of bias when a judge formerly prosecuted a nephew. And since none of the evidence overlapped, there was no risk that Judge Nastoff was "wedded" to a view of Davis's mitigation evidence.

**C.** The panel's mistaken analysis about bias is only the start of its AEDPA evasion. Even under the panel's framing—in which judicial bias is its own component—it still had to decide whether counsel's decision not to seek recusal displayed deficient performance. The panel rejected the state court's holding that counsel strategically decided not to seek Judge Nastoff's recusal. It did so by citing a Third Circuit holding that "no competent attorney would" proceed before a structurally deficient court. Panel Op.21 (quoting *McKernan v. Superintendent Smithfield SCI*, 849 F.3d 557, 566–67 (3d Cir. 2017)). That was doubly wrong.

Relying on circuit precedent to countermand a state court's holding is a "classic" AEDPA error. *Shoop v. Cunningham*, 143 S. Ct. 37, 44 (2022) (Thomas, J., dissenting from denial of certiorari). "[T]he views of the federal courts of appeals do not bind the [state court] when it decides a federal constitutional question, and disagreeing with the lower federal courts is not the same as ignoring federal law." *Johnson*, 568 U.S. at 305.

Regardless, the idea that no competent attorney would forgo a judicial recusal motion is not clearly established Supreme Court precedent. If anything, precedent says the opposite. The Constitution "does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Engle v. Isaac*, 456 U.S. 107, 134, (1982). That logic extends to judicial bias. Counsel may make a "tactical decision not to seek the trial judge's recusal" even when he is not the ideal judge. *Ward v. Norris*, 577 F.3d 925, 931 (8th Cir. 2009). Every recused judge must be replaced with another, so counsel is entitled to "compare[] the chance that" the current judge would rule against the defendant with "the chance that a different judge would not rule in favor of his client," and act accordingly if he "conclude[s] that his client was better off" under the status quo. *United States v. Bayless*, 201 F.3d 116, 130 (2d Cir. 2000). Counsel does not fail "an objective standard of reasonableness" if he "might sensibly have believed" that forgoing

recusal was in the defendant's best interest, even if the prediction does not bear out. *Id.*

Here, the record reveals plenty of support for the Ohio court's holding. First, Davis's counsel knew about Judge Nastoff's previous prosecution and "made a decision long ago not to challenge [him] on that." Tr., R.5-7, Page-ID#8322. His counsel also knew who would replace Judge Nastoff if he recused. Tr., R.5-6. PageID#8116–19. And Judge Nastoff was no stranger to one defense attorney—that counsel had practiced before the judge for two years. Tr., R.5-7, PageID#8326. Counsel may have forgone seeking recusal because they perceived Judge Nastoff as patient, fair, and reasonable. Indeed, Judge Nastoff ruled in Davis's favor on several objections, even when a dissenter on the sentencing panel would have ruled otherwise. *See, e.g.*, Tr., R.5-7, PageID#8211–14, 8220–21, 8227–28, 8234, 8248, 8383; Tr., R.5-8, PageID#8519, 8530. Finally, Davis's defense counsel had good reason to believe that not all former prosecutors would be closed-minded against the defense—one defense attorney was himself a former prosecutor. Tr., R.5-7, PageID#8223.

**D.** The panel's legal errors only grew when it evaluated the prejudice prong. Again skirting AEDPA, the panel said that forgoing a meritorious recusal motion is

presumptively prejudicial because judicial bias is a structural error. Panel Op.17 (citing *Coley v. Bagley*, 706 F.3d 741, 750 (6th Cir. 2013)).

That conclusion rested on circuit-level dicta, but even that dicta sits on shaky ground. The 2013 Sixth Circuit dicta, of course, is far afield from AEDPA's command to measure state-court decisions only against Supreme Court holdings. *See, e.g.*, *White v. Woodall*, 572 U.S. 415, 419 (2014). Nor has that dicta aged well. In 2017, the Supreme Court rejected the idea that all structural errors, because they require no showing of prejudice on direct review, jettison *Strickland*'s prejudice component. *Weaver v. Massachusetts*, 582 U.S. 286, 299–300 (2017). *Weaver* involved a courtroom-closure claim, but it reserved the question whether its analysis applied to other claims of structural error. *Id.* at 301–02. That reservation forecloses the panel's conclusion that the Ohio court deviated from federal law for AEDPA purposes by not finding prejudice. Questions left open in Supreme Court decisions are not clearly established for AEDPA purposes. *See Woodall*, 572 U.S. at 422–23, 427.

## III. On the claim of ineffective assistance regarding mitigation strategy, the panel misapplied *Strickland* and ignored a relevant state-court decision.

Finally, Davis claims that his counsel delivered ineffective assistance in handling the testimony of two witnesses at sentencing.

One witness, Ohio Parole Board Chair Cynthia Mausser, testified about Davis's likelihood of winning release on parole. She said Davis would *realistically* never be paroled, but stopped short of testifying that he would *certainly* never be paroled. Davis claims his counsel was ineffective because they had promised that Mausser would say Davis had no chance at parole.

The second witness, psychologist Dr. Robert Smith, testified that Davis suffered from borderline personality disorder at the time of the offense. Davis now says this testimony demonstrates ineffective assistance because Dr. Smith was not prepared to address questions about how Davis would adjust to life outside prison if he were paroled.

The panel accepted these arguments, but it did so without regard to the Ohio Supreme Court's decision reweighing the mitigation evidence and without deference to counsel's strategy.

**A.** Regarding Mausser's testimony, the panel found counsel's alleged errors prejudicial because the sentencing opinion said Mausser's testimony was "entitled [to] no weight." Panel Op.25. That approach failed to consider whether the Ohio Supreme Court's independent review—which gave weight to the "likelihood that Davis will never be released"—cured that error. *Davis*, 139 Ohio St. 3d at 147.

When a sentencer's consideration is tainted by error, "a state appellate court can cure" the error by "by independently 'reweighing' aggravating and mitigating factors and reaching a sentence" without laboring under the same error. *Lundgren v. Mitchell*, 440 F.3d 754, 783 (6th Cir. 2006); *see also Clemons v. Mississippi*, 494 U.S. 738, 748–50 (1990). That principle applies when—as here—a defendant claims an error "tend[ed] to prejudice the [sentencer's] view of the evidence," *Lundgren*, 440 F.3d at 783, even if the error stemmed from "fail[ure] to conduct an independent mitigation investigation," *Post v. Bradshaw*, 621 F.3d 406, 419 (6th Cir. 2010). Any trial-court error is "cured" when an appeals court "reweigh[s] the aggravating and mitigating factors and affirm[s] the sentence of death" without factoring in the prejudicial information. *Id.* at 420.

Here the Ohio Supreme Court's independent review cured any prejudice from Mausser's testimony. The Ohio Supreme Court found that, "given [Davis's] age (67), the likelihood that Davis will never be released from prison is credible enough to deserve some weight." *Davis*, 139 Ohio St. 3d at 147. In the end, Davis's counsel achieved the goal of Mausser's testimony: garnering mitigating weight for Davis's low chance of release. By not considering the Ohio Supreme Court's reweighing, the panel of this Court—not the Ohio courts—unreasonably applied clearly established federal law.

**B.** Regarding Dr. Smith's testimony, the panel determined that counsel's decision to continue with testimony about Davis's personality disorder was ineffective. Davis argues that counsel instead should have prepared Smith to discuss how Davis could successfully integrate into society if released on parole. The Ohio court correctly identified this decision as a strategy call that was presumptively reasonable despite hindsight-inspired regrets. *Davis*, 2013-Ohio-3878 at ¶¶23–24.

Yet again, the panel gave the Ohio court no heed under AEDPA. The panel called the Ohio court's analysis unreasonable for not viewing counsel's failure to prepare Smith for the possibility that Mausser's testimony would not establish that Davis had zero chance at parole. That is uncharitable, and veers dramatically from the Supreme Court's command that federal courts deploy a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 668. Here, reasonable counsel—especially reasonable counsel when viewed through AEDPA—could have determined that testimony about Davis reentering society would detract from the argument that Davis would realistically never be paroled. Condemning those strategy decisions now merely employs "hindsight" to undermine strategies that, at the time, "were reasonable and legitimate based on predictions of how the trial would proceed." *Premo*, 562 U.S. at 132.

## CONCLUSION

The Court should grant review en banc.


Respectfully submitted,

DAVE YOST
Ohio Attorney General

/s/ *Michael J. Hendershot*
MICHAEL J. HENDERSHOT*
Chief Deputy Solicitor General
  *Counsel of Record*
JANA M. BOSCH
Deputy Solicitor General
STEPHEN E. MAHER
Senior Assistant Attorney General
Ohio Attorney General's Office
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
Michael.Hendershot@OhioAGO.gov

*Counsel for Appellee*
  *Charlotte Jenkins*

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate procedure, that this petition for rehearing *en banc* complies with the type-volume requirements for such a petition, as it contains 3,751 words. *See* Fed. R. App. P. 35(b)(2)(A) & 40(b).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ Michael J. Hendershot*
Michael J. Hendershot

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of September, 2023, this petition was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Michael J. Hendershot*
Michael J. Hendershot

# APPENDIX

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

VON CLARK DAVIS,

*Petitioner-Appellant,*

No. 21-3404

*v.*

CHARLOTTE JENKINS, Warden,

*Respondent-Appellee.*

───────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:16-cv-00495—Susan J. Dlott, District Judge.

Argued:  December 13, 2022

Decided and Filed:  August 16, 2023

Before:  MOORE, COLE, and GIBBONS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Jordan S. Berman, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE SOUTHERN DISTRICT OF OHIO, Columbus, Ohio, for Appellant.  Jana M. Bosch, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Jordan S. Berman, Erin G. Barnhart, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE SOUTHERN DISTRICT OF OHIO, Columbus, Ohio, for Appellant.  Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

MOORE, J., delivered the opinion of the court in which COLE, J., joined. GIBBONS, J. (pp. 29–33), delivered a separate dissenting opinion.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  A three-judge panel convicted Von Clark Davis of aggravated murder and sentenced him to death.  On direct appeal, Davis's sentence was vacated, but on remand, the same three-judge panel again sentenced him to death.  We subsequently vacated Davis's death sentence on appeal of his first federal habeas petition.  A different three-judge panel again sentenced Davis to death.  Davis again petitioned for a writ of habeas corpus, and the district court denied the petition.  Now on appeal, Davis raises five claims:  (1) that the state violated Davis's constitutional rights by enforcing his 1984 jury waiver against him at his third sentencing hearing in 2009; (2) that Davis's trial counsel were constitutionally ineffective in failing to investigate and present mitigating evidence about the circumstances of Davis's prior conviction, which provided the aggravating circumstance that made him eligible for the death penalty; (3) that Davis's trial counsel provided ineffective assistance by failing to move to recuse one of the judges on Davis's 2009 sentencing panel for bias; (4) that Davis's trial counsel were constitutionally ineffective in failing to reasonably prepare and present mitigation evidence at Davis's third sentencing hearing; and (5) that Davis's trial counsel provided ineffective assistance by failing adequately to advise him of the collateral consequences of a jury waiver.  For the reasons that follow, we conclude that Davis's constitutional rights were violated when his 1984 jury waiver was enforced against him at his 2009 sentencing hearing and that his trial counsel also rendered ineffective assistance at that sentencing hearing, such that we doubt that the hearing produced a fair result.  Accordingly, we **AFFIRM** in part; **REVERSE** in part; and **REMAND** to the district court with instructions to **CONDITIONALLY GRANT** Davis's petition for writ of habeas corpus as to his first, third, and fourth claims.

# I. BACKGROUND

## A. Procedural History

In January 1984, a grand jury indicted Davis for aggravated murder (accompanied by capital and firearm specifications) and possessing a firearm while under a disability. After Davis waived his right to a trial by jury, a three-judge panel convicted him on all counts and sentenced him to death. On direct appeal, Davis's convictions were affirmed, but his death sentence was vacated. *State v. Davis*, No. CA84-06-071, 1986 WL 5989 (Ohio Ct. App. May 27, 1986) (*Davis I*), *rev'd in part*, 528 N.E.2d 925 (Ohio 1988) (*Davis II*). On remand, the same three-judge panel held a second sentencing hearing and again sentenced Davis to death, which was affirmed on appeal. *State v. Davis*, No. CA89-09-123, 1990 WL 165137 (Ohio Ct. App. Oct. 29, 1990) (*Davis III*), *aff'd*, 584 N.E.2d 1192 (Ohio 1992) (*Davis IV*).

The state trial court dismissed Davis's postconviction petition after conducting a limited evidentiary hearing. R. 4-20 (Entry of Dismissal at 1–9) (Page ID #2158–66) (*Davis V*). The Ohio Court of Appeals affirmed. *State v. Davis*, No. CA95-07-124, 1996 WL 551432 (Ohio Ct. App. Sept. 30, 1996) (*Davis VI*). The Ohio Supreme Court declined further review. *State v. Davis*, 674 N.E.2d 372 (Ohio 1997) (table) (*Davis VII*). Davis's two motions to reopen his direct appeal were dismissed as untimely. *State v. Davis*, 714 N.E.2d 384 (Ohio 1999) (*Davis VIII*).

In April 1997, Davis filed his first federal habeas petition, and the district court denied relief. R. 16-2 (2001 D. Ct. Op. & Order at 1–87) (Page ID #8947–9032) (*Davis IX*). On appeal, this court vacated Davis's death sentence. *Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007) (*Davis X*). Then in the state court, a different three-judge panel conducted a third sentencing hearing and sentenced Davis to death, which was affirmed on appeal. *State v. Davis*, No. CA2009-10-263, 2011 WL 646404 (Ohio Ct. App. Feb. 22, 2011) (*Davis XI*), *aff'd*, 9 N.E.3d 1031 (Ohio 2014) (*Davis XIV*). Davis unsuccessfully sought postconviction relief in state court. R. 4-47 (Entry & Order Dismissing Pet. Postconviction Relief at 1–18) (Page ID #6633–50) (*Davis XII*); *State v. Davis*, No. CA2012-12-258, 2013 WL 4806935 (Ohio Ct. App. Sept. 9, 2013) (*Davis XIII*). The Ohio Supreme Court declined further review. *State v. Davis*, 36 N.E.3d 188 (Ohio 2015) (table) (*Davis XV*).

In August 2016, Davis filed a second-in-time habeas petition raising twenty-six claims of constitutional error. R-6 (Pet. for Writ of Habeas Corpus) (Page ID #8563–838). The district court dismissed the petition and certified several claims for appeal. R. 64 (Order Adopting R. & R. in Part & Den. Pet.) (Page ID #10022–74). This court subsequently expanded the COA to certify a total of seven claims for appeal. Davis now timely appeals.

## B. Relevant Facts

### 1. The Offense

The Ohio Supreme Court summarized the facts as follows:

{¶2} On December 12, 1983, Davis offered Mark "Poppa" Lovette $60 in exchange for a favor. He then drove Lovette to a pawn shop, where Lovette bought a Raven P.25 semi-automatic handgun using Davis's money. Lovette gave the gun to Davis. Davis then gave Lovette more money and took him to a different store to buy ammunition.

{¶3} When Davis discovered that the ammunition did not fit the Raven, he took Lovette to a local gun store. There, Lovette bought a box of PMC .25–caliber automatic rounds, which he gave to Davis. Davis loaded the Raven and placed it under the driver's seat. After dropping Lovette off, Davis and Wade Coleman rode around drinking beer for 30 minutes to an hour.

{¶4} Later that day, Suzette Butler met her friend, Mona Aldridge, at the American Legion post in Hamilton. Shortly thereafter, Davis arrived. Davis and Butler had lived together for a time but had recently separated. Davis spoke with Butler at the bar, and eventually they sat together at a table and Aldridge joined them. Aldridge testified at trial that she did not observe any argument or harsh words between them.

{¶5} After a short time, Butler told Aldridge that she would be "right back" and asked Aldridge to watch her jacket, cigarettes, and drink. Davis and Butler then walked out the front door. Several minutes later, Aldridge checked on Butler, saw Davis pointing a gun at Butler's head, and panicked and retreated into the bar. Within moments, several people entered the bar saying that someone had been shot.

{¶6} Reginald Denmark and Cozette Massey witnessed the shooting. As they walked in front of the American Legion post, they saw a man and a woman talking. Two shots rang out, and they saw the woman—later identified as Butler—fall. As she fell, another shot was fired. Finally, once Butler was down, the man bent down and shot her in the head. Both Massey and Denmark identified Davis as the shooter.

{¶ 7} An autopsy performed the next day revealed that Butler had died of multiple gunshot wounds to the left side of her head. Stippling around one of the entrance wounds indicated that the muzzle of the murder weapon had been less than 20 inches from Butler's head when the shot causing that wound had been fired.

{¶ 8} Four spent PMC shell casings were collected at the murder scene. Ronald Dye, a criminalist with the Ohio Bureau of Criminal Identification and Investigation, examined the shells and concluded that all four had been chambered in the same gun. Dye examined the four bullets removed from Butler's head and determined that they had been fired from a handgun manufactured by either Raven or Astra.

*Davis XIV*, 9 N.E.3d at 1036–37.

## 2. Aggravating Circumstance

The aggravating circumstance that made Davis eligible for the death penalty was the fact that he had previously "been convicted of an offense an essential element of which was the purposeful killing of, or attempt to kill, another." *Davis II*, 528 N.E.2d at 927 (citing OHIO REV. CODE ANN. § 2929.04(A)(5)). Namely, he had pleaded guilty in 1971 "to second degree murder in connection with the stabbing death of his estranged wife, Ernestine Davis." *Davis VI*, 1996 WL 551432, at *1. Several years later, a man named Robert J. Beard wrote a letter to H.J. Bressler, Davis's trial counsel in the second-degree murder case, stating that Beard had been in a house with Ernestine on the day of her death, and was there when Davis arrived. *Id.* at *4; R. 4-19 (1993 Postconviction Pet. Ex. CC) (Page ID #2028–29). The letter suggested that Ernestine initiated the confrontation with Davis:

> [Ernestine] cursed to me about being tired of that bastard and would stick him. She withdrew a large knife from under the mattress and swore she would use it. . . . They were arguing in the kitchen, and when it became very loud I decided to leave coming down the stairs I remember him asking her why did she have a knife? Moving toward the door I saw Ernestine strike at Von with the knife, and then heard wrestling. To be honest with you, Ernestine was the aggressor and not Von, he was trying to talk to her. I couldn't see much more, only heard Ernestine yelling that she would kill him. . . . I know it wasn't premeditation because he did not have a knife with him, the knife that killed Ernestine was the knife she withdrew from the mattress, because I saw it.

R. 4-19 (1993 Postconviction Pet. Ex. CC) (Page ID #2028–29).  Davis's postconviction counsel following his second sentencing argued that this letter demonstrated mitigating circumstances regarding the statutory aggravator and that trial counsel were therefore ineffective for failing to investigate and present mitigating evidence about the prior conviction that made Davis eligible for the death penalty.  R. 4-18 (1993 Postconviction Pet.) (Page ID #1925–27).

### 3.  Jury Waiver and Composition of the Three-Judge Panel

In advance of his initial trial in 1984, Davis waived his right to a jury trial and instead elected to be tried by a three-judge panel.  R. 4-3 (Jury Waiver & Election of Three-Judge Panel) (Page ID #433).  The waiver form, signed by Davis, his counsel, and the initial trial judge, stated that Davis "voluntarily waive[d] [his] right to trial by jury and elect[ed] to be tried by a court to be composed of three judges, consisting of Judges Henry H. Bruewer, William R. Stitsinger, and John R. Moser."  *Id.*  Although the prosecutor did not sign the waiver agreement, it was typed on his letterhead, *id.*, and the prosecutor had previously agreed in a pretrial motions hearing to prepare the written waiver.  R. 5-1 (Mot. Hr'g Tr. at 37–38) (Page ID #7204–05).  At the waiver colloquy, the presiding judge again reiterated the names of the three judges that would form the panel.  *Id.* at 61 (Page ID #7225).

By the time of Davis's third sentencing hearing in 2009, however, one of the judges from the original panel had died, and the other two had retired.  *Davis XI*, 2011 WL 646404, at *2.  The sentencing court did not allow Davis to withdraw his original jury waiver from 1984, and instead enforced it against him.  *Id.*  He was thereafter sentenced to death by a new three-judge panel.  *Id.*

One of the judges on the new three-judge panel, Judge Nastoff, had previously worked as a prosecutor.  R. 5-7 (3d Sent'g Hr'g Tr. at 131) (Page ID #8321).  During his time as a prosecutor, Judge Nastoff had been on the prosecution team that sought a death sentence against Lahray Thompson, Davis's nephew.  *Id.*  Judge Nastoff himself "argued to the jury that [Thompson] should receive the death sentence."  *Id.*  In doing so, Judge Nastoff repeatedly told jurors that Thompson lied.  R. 4-46 (2011 Postconviction Pet. Ex. N at 1207) (Page ID #6458).  Davis alleges that during his prosecution of Thompson, Judge Nastoff "heard and cross

examined some of the very same mitigation evidence that Davis presented in his case." R. 4-46 (2011 Postconviction Pet. Ex. D, Menashe Aff. ¶ 23) (Page ID #6279). At Davis's third sentencing hearing, over which Judge Nastoff presided, Davis presented mitigation testimony from his sister, Carol Smith, who is Thompson's mother. R. 5-7 (3d Sent'g Hr'g Tr. at 131) (Page ID #8321). Judge Nastoff made the parties aware of his involvement in Thompson's case after the panel heard Smith's testimony. *Id.* Davis's counsel responded that, "[i]n the interest of full candor, we were aware that Your Honor, that you were involved in the prosecution, and we made a decision long ago not to challenge you on that." *Id.* at 132 (Page ID #8322). In a postconviction affidavit, Davis averred that his trial counsel "did not discuss at all with" him the decision not to seek the recusal of Judge Nastoff and that, had he been asked, he would have wanted them to seek Judge Nastoff's recusal. R. 4-46 (2011 Postconviction Pet. Ex. B, Davis Aff. ¶ 8) (Page ID #6271).

### 4. Mitigation Evidence at Davis's Third Sentencing Hearing

During opening argument at Davis's third sentencing hearing, his trial counsel promised that Cynthia Mausser, Chair of the Ohio Parole Board, would "testify based upon [Davis's] prior record, the fact that he committed the second murder, while he was still on parole from the first murder is that he will not be paroled." R. 5-7 (3d Sent'g Hr'g Tr. at 36–37) (Page ID #8225–26). Later in opening argument, his trial counsel again reiterated that, "we will note from Ms. Mausser's testimony that he will never be paroled." *Id.* at 38 (Page ID #8227). The issue of parole was critical because, under Ohio law in effect at the time of the offense, if the panel declined to impose a death sentence, the maximum available sentence would be thirty years to life, which would make Davis eligible for parole six years after the 2009 sentencing hearing. *Id.* at 36 (Page ID #8225).

The prosecution objected to Davis calling Mausser, stating that:

Ms. Mausser herself could not testify and has told me that she would not be in a position to be able to testify whether or not she would vote for parole or not vote for parole, it would be improper for her to say that she could not say what a majority of the board would do as they are not here. None of the board members, even if all seven or twelve were present would be able to say how they would vote

because this case is not in front of them. . . . The entire thing would be speculation.

*Id.* at 133–34 (Page ID #8323–24). Davis's counsel responded that "we will be in a position of surprise and affirmative damage if she testifies as the prosecution is suggesting because we, in fact, interviewed her four months ago and Ms. Cook will testify, if necessary, that that is not what we were told." *Id.* at 137 (Page ID #8327). The panel allowed Mausser to testify. *Id.* at 144–45 (Page ID #8334–35). When Davis's trial counsel posed a hypothetical with circumstances similar to Davis's case, Mausser responded that the individual "would likely spend a large portion of the remainder of their life in prison." *Id.* at 175 (Page ID #8365). On cross-examination, Mausser agreed that she did not have all the information necessary to know how she would vote on Davis's case, were it to be presented to the parole board, nor could she say how other board members would vote. *Id.* at 181–82, 184–85, 188–89 (Page ID #8371–72, 8374–75, 8378–79). In an affidavit obtained by postconviction counsel, Mausser averred that she "never told defense counsel that Mr. Davis would never be paroled." R. 4-46 (2011 Postconviction Pet. Ex. F, Mausser Aff. ¶ 4) (Page ID #6365).

Trial counsel later called Dr. Robert Smith, a clinical psychologist. R. 5-8 (3d Sent'g Hr'g Tr. at 230) (Page ID #8420). Dr. Smith opined that, at the time of the offense, Davis was suffering from alcohol dependence and borderline personality disorder. *Id.* at 248 (Page ID #8438). Regarding borderline personality disorder, Dr. Smith testified that:

> And within the institution he does well, which we would expect with someone with a personality disorder. Think about it. I am saying that you have got this dysfunctional style. If you put me in a very structured environment, with clear-cut rules and people who enforce those rules every day, the same way, I will adapt and I will adjust. My problem with borderline personality disorder is if I am in the community where I have no clear structure and I am reacting to whatever is happening to me throughout the day.

*Id.* at 258 (Page ID #8448). He further testified that a characteristic of borderline personality disorder is "unwarranted aggressive behavior that comes about with minor provocation" that is "out of proportion." *Id.* at 261 (Page ID #8451). Dr. Smith opined that impulsivity and reactivity characterized borderline personality disorder and that individuals diagnosed with it "act and then think about it afterwards" and do not consider "what the consequences will be" but

just "act out again based on what they are feeling." *Id.* at 263 (Page ID #8453). In an affidavit obtained by postconviction counsel, Dr. Smith stated that trial counsel did not tell him that parole was an issue in the case and that, had he known, he could have testified about how Davis "has learned to accept external rules and expectations regarding his behavior" and that he has developed coping strategies and can "weigh the potential consequences of his decisions and actions." R. 4-46 (2011 Postconviction Pet. Ex. I, Smith Aff. ¶¶ 11–12) (Page ID #6382).

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's decision to grant or deny a writ of habeas corpus. *Foust v. Houk*, 655 F.3d 524, 533 (6th Cir. 2011). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Where the state court fails to adjudicate a claim on the merits, however, AEDPA's deferential standard of review does not apply." *Williams v. Anderson*, 460 F.3d 789, 796 (6th Cir. 2006).

A state-court decision is contrary to clearly established federal law if "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A state-court decision unreasonably applies clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08.

Clearly established federal law "refers to the holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision." *Id.* at 412. "Although courts of appeals' decisions do not establish new rules, the court may look to such

decisions to inform its analysis of whether a legal principle had been clearly established by the Supreme Court." *Avery v. Prelesnik*, 548 F.3d 434, 436–37 (6th Cir. 2008).

## B. Jury Waiver

### 1. Exhaustion

"Exhaustion requires 'fair presentation' of the federal claim 'to the state courts.'" *Williams v. Mitchell*, 792 F.3d 606, 613 (6th Cir. 2015) (quoting *Bray v. Andrews*, 640 F.3d 731, 734–35 (6th Cir. 2011)). "To fairly present a federal claim, a state prisoner is required to present the state courts with 'both the *legal* and factual basis' for the claim." *Id.* (quoting *Anderson*, 460 F.3d at 806) (emphasis in original). Put differently, the petitioner must have presented the state courts with "a claim substantially equivalent to the [federal] claim." *Jalowiec v. Bradshaw*, 657 F.3d 293, 304 (6th Cir. 2011) (internal citations and quotation marks omitted).

Davis presented both the legal and factual basis for this claim in state court. On direct appeal of his third sentencing in the Ohio Court of Appeals, Davis's brief argued that the state "violate[d] Due Process and the Eighth and Sixth Amendment" by enforcing the jury waiver from 1984 "when the law has changed and the facts have changed." R. 4-42 (Direct Appeal Merit Br. at 4) (Page ID #5496). The brief also presented the factual basis for the claim, noting that Davis was sentenced by a panel consisting of different judges than he had agreed to in his original jury waiver. *Id.* at 6 (Page ID #5498). Davis's brief in the Ohio Supreme Court also extensively covered both the legal and factual bases of this claim. R. 4-43 (Ohio Sup. Ct. Merit Br. at 4–20) (Page ID #5859–75). Davis therefore properly exhausted this claim in the state courts.

### 2. AEDPA Deference

Davis claims that the Ohio Supreme Court unreasonably applied clearly established federal law in determining that the sentencing court's enforcement of his 1984 jury waiver against him at his third sentencing hearing did not violate the federal constitution. In its decision, the Ohio Supreme Court concluded that "although the Sixth Amendment guarantees the right to trial by jury, neither the Sixth nor the Eighth Amendment creates a constitutional right to

be *sentenced* by a jury, even in a capital case." *Davis XIV*, 9 N.E.3d at 1042. The Ohio Supreme Court relied on the Supreme Court's decision in *Spaziano v. Florida*, 468 U.S. 447 (1984), in reaching this conclusion. Thus, the Ohio Supreme Court determined that a capital defendant could be sentenced to death without a jury, even absent any waiver. *Id.* The court further held that the changed circumstances (i.e., the new three-judge panel) did not have any constitutional implications for Davis's waiver, because that would require that a defendant "possess more information than courts have usually held sufficient for a knowing and intelligent jury waiver." *Id.*

The Ohio Supreme Court unreasonably applied clearly established federal law to Davis's jury claim. First, the Supreme Court's decisions in *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), established the constitutional right to have a jury decide the factual findings necessary to impose a death sentence. As the Supreme Court has held:

> *Spaziano* and *Hildwin* summarized earlier precedent to conclude that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury." Their conclusion was wrong, and irreconcilable with *Apprendi*. Indeed, today is not the first time we have recognized as much.

*Hurst v. Florida*, 577 U.S. 92, 101 (2016) (quoting *Hildwin v. Florida*, 490 U.S. 638, 640–41 (1989)). Although *Hurst* was decided after Davis's third sentencing in 2009, both *Ring* and *Apprendi* preceded the 2009 sentencing hearing. And the Supreme Court made explicit in *Hurst* that *Ring*, decided in 2002, had already clearly established this constitutional right: "In *Ring*, we held that another pre-*Apprendi* decision—*Walton*—could not 'survive the reasoning of *Apprendi*.'" *Id.* (quoting *Ring*, 536 U.S. at 603) (internal citation omitted). Thus, the Ohio Supreme Court's decision that a capital defendant can be sentenced to death without a jury, even absent any waiver, because there is no constitutional right to jury factfinding in capital sentencing, was an unreasonable application of then clearly established federal law. Once a petitioner's claim overcomes the relitigation bar imposed by 28 U.S.C. § 2254(d), we apply de novo review, because no deference is owed to a state-court decision premised upon an

unreasonable application of clearly established federal law.  *See Rice v. White*, 660 F.3d 242, 252 (6th Cir. 2011).

Second, although the Ohio Supreme Court briefly discussed whether changed circumstances between 1984 and 2009 impacted the knowing and intelligent nature of his waiver, it failed to discuss the constitutional implications of enforcing a waiver against Davis even though the state did not comply with the express language of the waiver, instead relying solely on *Spaziano* to dispose of Davis's claim.  *See Davis XIV*, 9 N.E.3d at 1042.  We have previously held that when a state court relies on one component of a claim to adjudicate the claim on the merits, we review de novo the component of the claim that state court did not address.  *Rayner v. Mills*, 685 F.3d 631, 639 (6th Cir. 2012).  We explained that this comported with the rule of *Harrington v. Richter*, 562 U.S. 86 (2011), because "the Supreme Court expressly limited application of its holding [in *Richter*] to cases in which the state court's decision 'is unaccompanied by an explanation.'"  *Rayner*, 685 F.3d at 638 (quoting *Sussman v. Jenkins*, 642 F.3d 532, 534 (6th Cir. 2011)).  We also noted that this approach ensured harmony with the Supreme Court's prior decisions in *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005), both of which "recognized that the AEDPA standard applies to the 'claim' of ineffective assistance of counsel before evaluating an unreviewed prong de novo."  *Rayner*, 685 F.3d at 639.  Because the state court did not adjudicate the merits of Davis's claim as to the due-process implications of the violation of the terms of his written waiver agreement, we apply de novo review to that portion of his claim.  We therefore review de novo Davis's entire jury waiver claim, given that part of his claim was not adjudicated on the merits in state court, and the other part of his claim was adjudicated based on an unreasonable application of clearly established federal law.

### 3.  Enforcement of Jury Waiver

Davis claims that his rights under the Due Process Clause and the Sixth and Eighth Amendments were violated when his 1984 jury waiver was enforced against him at his third sentencing hearing in 2009, because the state did not comply with the plain terms of the waiver agreement, which named the three judges who would try and sentence him.

In determining whether the enforcement of Davis's waiver against him in 2009 was valid, we are guided by the Supreme Court's instruction that, because "the right of jury trial is fundamental, courts indulge every reasonable presumption against waiver." *Aetna Ins. Co. v. Kennedy to Use of Bogash*, 301 U.S. 389, 393 (1937). The Court has held that waivers of constitutional rights "are essentially contracts," although "the analogy may not hold in all respects." *Puckett v. United States*, 556 U.S. 129, 137 (2009). If the government "takes on certain obligations" in a waiver agreement, and "those obligations are not met, the defendant is entitled to seek a remedy." *Id.* Because the waiver of a constitutional right is involved, a breach of a waiver agreement has constitutional dimensions. *See United States v. Barnes*, 278 F.3d 644, 648 (6th Cir. 2002). We have previously held that "a defendant has a due process right to hold the government to the promises it made that induced him to" waive the right. *United States v. Warren*, 8 F.4th 444, 448 (6th Cir. 2021). It therefore follows that Davis has the right to require the state to comply with the terms of the jury-waiver agreement or, in the alternative, to withdraw his waiver. *Cf. Sinistaj v. Burt*, 66 F.3d 804, 809 (6th Cir. 1995) (denying analogous habeas claim because petitioner's jury waiver did not specify that it applied only to a trial before a particular named judge).

The warden raises the fact that the prosecutor did not sign the jury waiver form, although it was prepared by the prosecutor and written on the prosecutor's letterhead. It was, however, signed by one of the trial judges. R. 4-3 (Jury Waiver & Election of Three-Judge Panel) (Page ID #433). Although a prosecutor's signature may be significant for the enforcement of a plea agreement, we note that, despite some similarities between a jury waiver and a plea agreement, the analogy does not hold in all respects. *See Puckett*, 556 U.S. at 137. In the typical case involving a plea-agreement violation, it is the prosecution's refusal to honor a condition to which it explicitly agreed that forms the basis for the defendant's constitutional claim. *See, e.g.*, *Barnes*, 278 F.3d at 646–48 (finding violation where prosecution agreed to recommend defendant be sentenced at the low end of the guidelines but subsequently failed to state the recommendation on the record at defendant's sentencing hearing); *Warren*, 8 F.4th at 448 (finding violation where prosecution agreed not to "suggest in any way" that a variance from the sentencing guidelines range was appropriate but then suggested to the sentencing court that it would have made different guidelines recommendations had it known about other facts regarding

defendant's criminal history). Here, however, the violation did not occur because of the prosecutor's conduct, but instead because the *trial court* enforced the waiver against Davis without holding up its end of the bargain regarding the composition of the three-judge panel.[1] Because a judge of that same trial court agreed to the terms of Davis's jury waiver, including the composition of the panel, and signed the waiver agreement, the prosecution's lack of signature has no effect on Davis's claim. Davis's due-process rights were therefore violated by the enforcement of the waiver against him at his 2009 resentencing, in breach of the explicit terms of his waiver.

The dissent criticizes our conclusion, incorrectly claiming that we "transform[] a waiver of jury trial into a waiver of jury trial only if three particular judicial officers make the sentencing decision." Dissent at 29. This misrepresents our decision. As a practical matter, almost all jury waiver agreements do not specify the judge or judges that will hear a case, and thus our conclusion here will have no bearing on cases involving such agreements. If the state does not wish to be bound by the requirement that certain judges will hear a case, it can simply choose not to include such language in any agreements involving the waiver of a defendant's constitutional rights. Thus, we do not conclude that there is a "constitutional right to have a particular judge make any decision." Dissent at 29. We simply hold, as has always been the case, that if a defendant waives a constitutional right in exchange for certain obligations, those obligations must be met if the waiver is to be enforced.

### 4. Prejudice

It is an open question in our circuit whether Davis must satisfy the prejudice requirements of *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), in order to obtain relief on this claim. When such a claim is raised on direct appeal, automatic reversal is required so long as the defendant preserved their objection to the waiver-agreement violation. *Puckett*, 556 U.S. at 141; *Warren*, 8 F.4th at 450–51. This suggests that the violation of a jury-waiver agreement is per se reversible error and thus a habeas petitioner need not meet the requirements of *Brecht* to obtain

---

[1]Although it is not dispositive of the issue, we note that the jury-waiver agreement at issue in *Sinistaj* was signed by the defendant and his trial counsel only. 66 F.3d at 806. In analyzing the issue, this court did not discuss the fact that the agreement was not signed by the prosecution or by the trial court.

relief. *See Spytma v. Howes*, 313 F.3d 363, 372 (6th Cir. 2002) (concluding that, on habeas review, while a claim of ineffective assistance of counsel regarding jury-waiver issues is subject to a prejudice analysis, "the actual jury waiver issue is arguably not subject to harmless error analysis"). And not requiring a showing of prejudice under *Brecht* makes sense given that the violation involved a denial of the jury-trial right, the deprivation of which the Supreme Court has held "unquestionably qualifies as 'structural error.'" *Sullivan v. Louisiana*, 508 U.S. 275, 282 (1993).

We need not decide this issue, however, because Davis has demonstrated prejudice under the *Brecht* standard. *Brecht* requires a showing that the error had a "substantial and injurious effect or influence" on the outcome of the proceedings. 507 U.S. at 637; *see also Fry v. Pliler*, 551 U.S. 112, 121–22 (2007). As a result of the enforcement of Davis's jury waiver against him at his third sentencing hearing, Davis was sentenced to death by a panel that included a judge with a risk of actual bias that is too high to be constitutionally tolerable. *See infra* section II.D.1. This alone was enough to have a substantial and injurious effect on the outcome of the proceedings, because it ensured that Davis was sentenced by a court that was structurally deficient. We conclude that Davis is entitled to relief on this claim.

## C. Ineffective Assistance of Counsel for Failing to Investigate the Circumstances of Davis's Prior Conviction

Next, Davis contends that his trial counsel were constitutionally ineffective for failing to investigate and present mitigating evidence about the circumstances of his prior conviction, which formed the death specification for his capital conviction. The warden argues that Davis failed to exhaust this claim in state court and that, as a result, it is procedurally defaulted. *See* 28 U.S.C. § 2254(b)(1)(A). Davis first raised this claim in his state postconviction proceedings following his second sentencing. R. 4-18 (1993 Postconviction Pet.) (Page ID #1925–27). The Ohio Court of Appeals held the claim was barred by res judicata because Davis did not raise it on direct appeal even though Beard's "letter was time-stamped for the record by the clerk's office in 1981," and had precipitated the filing of a new-trial motion for his prior conviction for second-degree murder. *Davis VI*, 1996 WL 551432, at *4. Davis did not raise this claim in his state postconviction proceedings following his third sentencing in 2009. R. 4-46 (2011

Postconviction Pet.) (Page ID #6236–64).  Davis argues that, because our decision in *Davis X* granted relief as to only his sentence, his conviction was left in place and thus he properly exhausted this claim by presenting it to the state courts in his postconviction petition following his second sentencing.  Appellant Reply Br. at 11–12.

The warden cites *King v. Morgan*, 807 F.3d 154, 160 (6th Cir. 2015), for the proposition that Davis's claim is unexhausted.  *King*, however, dealt with the question of whether a second-in-time federal habeas petition following a new judgment constituted a "second or successive" petition such that the limitations of 28 U.S.C. § 2244 apply.  *Id.* at 156–57.  In answering that question in the negative, we simply reminded petitioners that "[a]ll habeas petitioners, including King on remand, must show that they did not procedurally default each claim and that they exhausted each claim."  *Id.* at 160.  That statement does not answer the question of what is necessary to meet the exhaustion requirement when a second judgment has been entered relating to a petitioner's already-existing conviction.

But we need not answer the question of whether a habeas petitioner must raise claims relating to their conviction anew in state-postconviction proceedings following a new sentencing judgment in order to meet the exhaustion requirement, because Davis's claim relates to his sentence and thus is plainly unexhausted following his third sentencing.  Although Davis's federal habeas petition raised this claim as relating to his conviction, R. 6 (Pet. for Habeas Corpus at 152–55) (Page ID #3725–28), and the district court understood it as such, R. 64 (Order Adopting R. & R. in Part & Den. Pet. at 45–47) (Page ID #10066–68), Davis's brief in this court focuses exclusively on the impact of his trial counsel's alleged deficiencies at his sentencing hearing.  *See* Appellant Br. at 46–48.  Because Davis's opening brief did not raise the argument that this claim related to his conviction, he has waived that argument.  *See Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010).  And the argument is unexhausted as to Davis's sentence, because he did not raise it again in his state-postconviction proceedings following his third sentencing, despite being represented by different counsel at his third sentencing hearing than at his second sentencing hearing.  R. 4-46 (2011 Postconviction Pet. ¶¶ 9, 25) (Page ID #6237, 6239).  The factual basis for the claim was thus not presented to the state courts, as required by

the exhaustion doctrine.  *See Williams*, 792 F.3d at 613.  We therefore hold that this claim is procedurally defaulted.

## D.  Ineffective Assistance of Counsel for Failing to Move to Recuse a Judge for Bias

Davis claims that trial counsel at his third sentencing hearing were constitutionally ineffective for failing to move to recuse Judge Nastoff for bias or the appearance thereof, given his prosecution of Davis's nephew.  The Ohio Court of Appeals concluded that trial counsel's decision not to seek Judge Nastoff's recusal was strategic and therefore it did not constitute ineffective assistance of counsel.  *Davis XIII*, 2013 WL 4806935, at *6.  Because the Ohio Court of Appeals adjudicated this claim on the merits, the deference requirements of § 2254(d) apply.

To demonstrate ineffective assistance of counsel, a petitioner typically must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  We, however, have held that because "judicial bias is a structural defect both when actual and when merely unconstitutionally probable, if either type of judicial bias is proven, *Strickland* prejudice need not be proven."  *Coley v. Bagley*, 706 F.3d 741, 750 (6th Cir. 2013) (internal citation omitted).  The operative questions, therefore, are whether Judge Nastoff's potential for bias violated due process, and, if so, whether the Ohio Court of Appeals unreasonably applied federal law in determining that trial counsel's decision not to seek recusal was strategic.  *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) (holding that, if trial counsel's failure to litigate a constitutional claim competently "is the principal allegation of ineffectiveness," petitioner must also prove that the underlying constitutional claim is meritorious).

### 1.  Judicial Bias

The Ohio Court of Appeals did not address the issue of whether Judge Nastoff's potential bias rose to the level of constitutional error and instead simply decided that the decision of Davis's trial counsel not to seek Judge Nastoff's recusal was strategic.  We therefore review de novo the judicial-bias portion of Davis's claim.  *See Rayner*, 685 F.3d at 638–39 (holding that when a state court reviews only one portion of a claim in disposing of the claim, we review de novo any portions of the claim that the state court did not review).  The dissent confusingly

argues that "Davis's claim fails on AEDPA review. . . because it is not clearly established federal law that a judge's prior involvement in the prosecution of a defendant's family member creates 'an impermissible risk of actual bias' in the defendant's case." Dissent at 30–31 (quoting *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016)).  But such a showing is not required, because the Supreme Court has confirmed that when no "state courts below [have] reached" a prong of a petitioner's claim, "our review is not circumscribed by" AEDPA's requirements.  *Wiggins*, 539 U.S. at 534.  The dissent offers no reason that the Supreme Court's guidance in *Wiggins* and our prior precedent in *Rayner* ought not to apply here.  Instead, the dissent simply assumes that AEDPA deference applies despite the fact that no state court reviewed the judicial bias portion of Davis's claim.  Seeing no reason not to apply the rule of *Wiggins* and *Rayner*, we review de novo this prong of Davis's claim.

The Supreme Court has held that judicial bias violates due process when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  The standard is objective, and thus courts ask "not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009).  This is because "both the appearance and reality of fairness" must be preserved so that litigants are assured that "the arbiter is not predisposed to find against [them]." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

We have previously held that a petitioner claiming judicial bias must overcome the presumptions of judicial impartiality and regularity, as well as the presumption of "'honesty and integrity in those serving as adjudicators'" and that "judges know the law and apply it in making their decisions." *Coley*, 706 F.3d at 751 (quoting *Withrow*, 421 U.S. at 47).  Although *Coley* recognized that "exposure to bad facts and formation of an opinion based on them are not enough to establish bias," this case is easily distinguishable from *Coley*. *Id.* at 750.  In *Coley*, the judge had previously been exposed to bad facts about the defendant outside of the record, but it was in her official capacity as a judge, and she did not investigate the facts further, nor did she even read the source of the bad facts. *Id.* at 749–51.  Instead, the judge had heard about the facts

second-hand from the defense attorney, at which point she contacted the police so that they could properly handle any investigation into the issue.  *Id.*  Thus, we concluded that it left "the trial judge as neither investigator nor prosecutor, but simply a judge to whom the presumption of impartiality applies." *Id.* at 751.

Here, Judge Nastoff was, in fact, acting as a prosecutor when he learned of some of the mitigation evidence that Davis later presented at his third sentencing hearing.  *See* R. 4-46 (2011 Postconviction Pet. Ex. D, Menashe Aff. ¶ 23) (Page ID #6279).  Unlike the judge in *Coley*, who was acting as a neutral arbiter, Judge Nastoff was necessarily a biased actor, because it was his job as a prosecutor to represent the interests of the state.  And Judge Nastoff did not simply receive the information and pass it on to the relevant authorities; he actively cross-examined witnesses on the same mitigation evidence that Davis would later present at his sentencing hearing, where Judge Nastoff was required to weigh that same evidence as a neutral arbiter.  *Id.* The presumptions that we applied in *Coley* are therefore inapplicable to the facts in Davis's case.

For the above-stated reasons, this case is much closer to *Williams v. Pennsylvania*,[2] which concluded that "there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case."  579 U.S. at 8.  Although it is true that Judge Nastoff served as a prosecutor in Thompson's case and not in Davis's case, he did have "significant, personal involvement as a prosecutor" in the cross-examination, and therefore the undermining and discrediting of, critical mitigation evidence that was equally applicable to Davis's case.  *See* R. 4-46 (2011 Postconviction Pet. Ex. D, Menashe Aff. ¶ 23) (Page ID #6279).

In coming to its decision in *Williams*, the Court reasoned that there is "a risk that the judge 'would be so psychologically wedded' to his or her previous position as a prosecutor that the judge 'would consciously or unconsciously avoid the appearance of having erred or changed

---

[2]Although we review de novo this portion of Davis's claim and so we are not required to confine our discussion to clearly established federal law, we note that we do not rely on the holding of *Williams* to decide Davis's claim.  The legal reasoning anchoring *Williams* was established by both *Withrow*, decided in 1975, and *In re Murchison*, 349 U.S. 133 (1955).  We therefore decide Davis's claim on the holdings of *Withrow* and *Murchison* alone.  We nevertheless include a discussion of *Williams* here for the sake of completeness and as an example of how the Supreme Court applied the legal reasoning of *Withrow* and *Murchison* to a set of facts similar to those in Davis's case.

position.'" 579 U.S. at 9 (quoting *Withrow*, 421 U.S. at 57). Likewise, the Court concluded that "the judge's 'own personal knowledge and impression' of the case, acquired through his or her role in the prosecution, may carry far more weight with the judge than the parties' arguments to the court." *Id.* at 9–10 (quoting *In re Murchison*, 349 U.S. 133, 138 (1955)). This logic applies with equal force to Judge Nastoff's role as a prosecutor in cross-examining the same mitigation evidence that Davis would later present at his sentencing hearing. There is an impermissible risk that Judge Nastoff's critical view of the mitigation evidence from his time as a prosecutor would carry more weight than the arguments that Davis actually presented to the court. Similarly, given his role in arguing that Thompson ought to receive a death sentence, there is a danger that Judge Nastoff remained "psychologically wedded" to his position as a prosecutor and thus would not want to give the appearance of reversing his position on the merits of the mitigation evidence.

For these reasons, "the probability of actual bias on the part of" Judge Nastoff "is too high to be constitutionally tolerable," *Withrow*, 421 U.S. at 47, especially in a death-penalty case. The potential for bias on behalf of Judge Nastoff at Davis's third sentencing hearing was intolerably high and thus violated due process.

## 2. Deficient Performance

The remaining question is therefore whether the Ohio Court of Appeals unreasonably applied clearly established federal law in determining that trial counsel's decision not to seek recusal was strategic and therefore did not constitute deficient performance. The Ohio Court of Appeals provided little reasoning for its holding, other than the fact that trial counsel were aware that Judge Nastoff had prosecuted Thompson and still chose not to challenge him. *Davis XIII*, 2013 WL 4806935, at *6.

We conclude that the Ohio Court of Appeals unreasonably applied *Strickland* and its progeny in holding that trial counsel's decision not to move for recusal was strategic. Although trial counsel's strategic choices are protected, they must be "reasonable" based on the "totality of the circumstances." *Strickland*, 466 U.S. at 681 (internal citations and quotation marks omitted). In its decision, the Ohio Court of Appeals did not even identify the appropriate federal

constitutional standard for determining judicial bias, let alone apply it to the facts of Davis's case. Without determining whether Judge Nastoff's risk of bias was too high to be constitutionally tolerable, the Ohio Court of Appeals could not properly determine whether trial counsel's decision was reasonably strategic or not, because the potential for bias necessarily informs the reasonableness of trial counsel's decision under the circumstances. *Cf. Dickerson v. Bagley*, 453 F.3d 690, 697 (6th Cir. 2006) ("[T]he state court unreasonably applied clearly established Supreme Court precedent when it simply assumed that counsel's oversights were motivated by strategy."). The Supreme Court, moreover, has held that trial counsel must consult with their clients regarding important decisions and overarching strategy. *Strickland*, 466 U.S. at 688; *Florida v. Nixon*, 543 U.S. 175, 187 (2004). Davis's trial counsel did not do so. R. 4-46 (2011 Postconviction Pet. Ex. B, Davis Aff. ¶ 8) (Page ID #6271).

One of our sibling circuits has likewise held that a state court unreasonably applied *Strickland* in finding that trial counsel did not perform deficiently in "advis[ing] his client to proceed before a court that was structurally deficient" as a result of the judge's potential for bias, which the Third Circuit concluded was "something no competent attorney would ever do." *McKernan v. Superintendent Smithfield SCI*, 849 F.3d 557, 566–67 (3d Cir. 2017). For the same reasons, Davis's trial counsel performed deficiently, because no competent attorney would reasonably choose to proceed with a capital-sentencing hearing before a court that was constitutionally deficient. Davis is therefore entitled to relief on this claim.

## E. Ineffective Assistance of Counsel for Failing Adequately to Investigate, Prepare for, and Present Mitigating Evidence

### 1. AEDPA Deference

Davis argues that trial counsel at his third sentencing hearing were constitutionally ineffective for failing to reasonably investigate, prepare for, and present mitigation testimony from Cynthia Mausser and Dr. Robert Smith. The Ohio Court of Appeals concluded that the decision to call Mausser as well as the "decision to engage, or not engage, in a particular line of questioning" were "presumed to be the product of sound trial strategy" and therefore did not constitute ineffective assistance of counsel. *Davis XIII*, 2013 WL 4806935, at *5.

Although *Strickland* established that it is "strongly presumed" that counsel performed adequately and reasonably exercised their professional judgment in making decisions, it did not create an irrebuttable presumption that any act with strategic implications is reasonable and cannot constitute deficient performance. 466 U.S. at 690. The Supreme Court has confirmed that taking the approach that the Ohio Court of Appeals took constitutes an incorrect reading of *Strickland*. *See Wiggins*, 539 U.S. at 527 ("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy."). This court has also reached the same conclusion. *Dickerson*, 453 F.3d at 697 ("[T]he state court unreasonably applied clearly established Supreme Court precedent when it simply assumed that counsel's oversights were motivated by strategy, instead of requiring a complete and thorough mitigation investigation as mandated by *Strickland* and its progeny."). In concluding that it would "not question counsel's strategic decision" regarding questioning witnesses, the Ohio Court of Appeals unreasonably applied *Strickland* by imposing a far higher presumption of reasonableness than *Strickland* requires, and by failing to consider the reasonableness of the investigation and preparation that supported trial counsel's choices, as required by *Wiggins*. *Davis XIII*, 2013 WL 4806935, at *5. Because the entirety of the Ohio Court of Appeals' decision on the merits turns on this unreasonable application of *Strickland* and *Wiggins*, we review de novo this claim, because no deference is owed to a state-court decision premised upon an unreasonable application of clearly established federal law. *See Rice*, 660 F.3d at 252.

The Supreme Court's precedents, moreover, clearly establish that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Trial counsel promised in opening argument that Mausser would provide specific testimony, despite failing adequately to investigate what her testimony would be, and called her to testify even after being warned by the prosecution that Mausser would not provide the promised testimony. This court has already concluded that it is an unreasonable application of clearly established federal law to conclude that trial counsel did not perform deficiently in such a scenario. *English v. Romanowski*, 602 F.3d 714, 728–29 (6th Cir. 2010); *see also Avery*, 548 F.3d at 436–37 (holding that a court of

appeals may look to its own decisions to determine whether a legal principle has been clearly established by the Supreme Court). In *English*, this court held that "it was objectively unreasonable for English's trial attorney to decide before trial to call [English's then-girlfriend] as a witness, make that promise to the jury, and then later abandon that strategy, all without having fully investigated [his then-girlfriend] and her story prior to opening statements." 602 F.3d at 728. This logic applies with equal force to Davis's counsel in their failure adequately to investigate what testimony Mausser would actually give before promising the specifics of her testimony in opening argument.

As noted above, the Ohio Court of Appeals failed to address the fact that Davis raised his claim under the rubric of trial counsel's failure to *investigate* and *prepare for* Mausser and Dr. Smith's testimony, R. 4-46 (2011 Postconviction Pet. ¶¶ 64–65, 76–77) (Page ID #6248, 6251), instead characterizing it as grounded in trial counsel's decision to call Mausser and engage in particular lines of questioning with Mausser and Dr. Smith, *Davis XIII*, 2013 WL 4806935, at *5. The Ohio Court of Appeals thus ignored the Supreme Court's warning that, in such cases, the "principal concern" is "not whether counsel should have presented" certain mitigation evidence, but instead "whether the investigation supporting counsel's decision . . . *was itself reasonable*." *Wiggins*, 539 U.S. at 522–23 (emphasis in original). For this reason, to the extent that Davis's claim is rooted in trial counsel's failure adequately to investigate and prepare for Mausser and Dr. Smith's testimony, there was no state court adjudication on the merits, and we review de novo the claim, because the deference requirements of 28 U.S.C. § 2254(d) do not apply.

## 2. Deficient Performance

We have repeatedly held that trial counsel perform deficiently when they either present or choose not to present witness testimony based on inadequate investigation and preparation. *See English*, 602 F.3d at 728–29; *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000) ("[D]efense counsel's failure to have questioned [the witness] in this regard prior to trial is inexcusable. Defense counsel should have known [the witness's] opinion on this ultimate issue and should have prepared accordingly."). The Supreme Court has likewise frequently faulted trial counsel for failing adequately to investigate mitigation evidence in preparation for their client's sentencing. *See Wiggins*, 539 U.S. at 534; *Williams*, 529 U.S. at 395–96.

For the reasons stated in the foregoing section, trial counsel performed deficiently in failing adequately to investigate and prepare for Mausser's testimony in advance of promising her testimony at opening argument. Our decision in *English* controls. 602 F.3d at 728–29.

After Mausser's testimony failed to establish that Davis would never be paroled, trial counsel then failed to prepare Dr. Smith for the fact that Davis potentially being paroled would be an issue. R. 4-46 (2011 Postconviction Pet. Ex. I, Smith Aff. ¶ 11) (Page ID #6382). Because of this failure, Dr. Smith's testimony focused on Davis's state of mind in 1984 and how individuals with borderline personality disorder can adapt to a carceral environment, R. 5-8 (3d Sent'g Hr'g Tr. at 248–63) (Page ID #8438–53), instead of addressing how Davis has changed and might be able to adapt well, were he to be paroled, R. 4-46 (2011 Postconviction Pet. Ex. I, Smith Aff. ¶ 12) (Page ID #6382). This was not a reasonable exercise of professional judgment, and it compounded trial counsel's failure adequately to prepare for and investigate Mausser's testimony. It is especially unreasonable given that two prior panels had heard and rejected similar psychological testimony and that, at Davis's second sentencing hearing, the panel had in fact used such testimony in determining that a death sentence was appropriate. R. 4-46 (2011 Postconviction Pet. Ex. D, Menashe Aff. ¶ 17) (Page ID #6278). "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. The combination of Mausser's testimony and the fact that a prior sentencing panel had found that such psychological testimony was aggravating for Davis would lead a reasonable attorney to investigate further and prepare Dr. Smith differently for his testimony to address both the parole issue and any issues that prior panels had found with the psychological testimony. Davis's counsel did not do so, and thus performed deficiently.

### 3. Prejudice

Because the Ohio Court of Appeals held that trial counsel's performance was not deficient, it did not address the prejudice prong of Davis's claim, and thus we review de novo whether Davis was prejudiced by trial counsel's performance. *See Wiggins*, 539 U.S. at 534; *Williams*, 460 F.3d at 804. To show prejudice, Davis must show "a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This probability must be "sufficient to undermine confidence in the outcome." *Id.*

Davis was prejudiced by trial counsel's deficient performance. The sentencing panel described Mausser's testimony as "highly speculative and unconvincing" and determined it was "entitled no weight" as a mitigating factor. R. 4-39 (3d Sent'g Op. at 10) (Page ID #4933). Following Davis's second sentencing hearing, however, without Mausser's testimony, the Ohio Supreme Court found that the probability that Davis would never be paroled if he were not sentenced to death was entitled to "some weight in mitigation." *Davis IV*, 584 N.E.2d at 1198. Mausser's testimony therefore actively detracted from Davis's case in mitigation. The 2009 panel's sentencing opinion also highlighted the fact that "Dr. Smith failed to forecast Defendant's behavior or recommend a treatment plan, should he eventually be released from prison," which demonstrates that such evidence would have been beneficial to the panel in weighing mitigation evidence. R. 4-39 (3d Sent'g Op. at 8) (Page ID #4931). The dissent argues that because the panel gave weight to Davis's good behavior while previously incarcerated, Dr. Smith's testimony did not prejudice Davis. Dissent at 33. But the panel actually decided to attribute "little weight" to Davis's good behavior while in prison as a mitigating factor, *id.* at 10 (Page ID #4933), which was likely related to the parole issue and the fact that Dr. Smith did not testify about Davis's ability to rejoin society were he to be paroled. Thus, Dr. Smith's testimony did in fact prejudice Davis.

The dissent also fails to discuss the testimony that Dr. Smith would have provided, had trial counsel effectively prepared him for the parole issue. Dr. Smith could have testified that "with time, maturity, and freedom from drugs and alcohol, someone with Borderline Personality Disorder will gain insight and develop coping skills that would enable him to adjust to living in the outside world." R. 4-46 (2011 Postconviction Pet. Ex. I, Smith Aff. ¶ 12) (Page ID #6382). He also would have testified that Davis "at the present time is a different person than he was when he was admitted to [the Ohio Department of Rehabilitation and Correction] in 1984." *Id.* Furthermore, Dr. Smith would have testified that:

> Having been in a structured setting for the past 27 years, Von has learned to accept external rules and expectations regarding his behavior. He has developed coping strategies to deal effectively with frustration, annoyance, disappointment, etc. He has learned to weigh the potential consequences of his decisions and actions.

*Id.* Finally, he would have "explained that the parole process itself would provide Von with significant structure and guidelines that would assist him in successfully re-entering society." *Id.* ¶ 13) (Page ID #6382). This testimony would have left the panel with a substantially different picture of Davis than Dr. Smith's actual testimony provided, because his testimony focused Davis's state of mind in 1984, and did not explain how Davis had changed in the intervening years and why he could now be paroled without necessarily presenting a danger to the community. It also would have strengthened the evidence of Davis's good behavior while in prison, because it would have established how his behavior was demonstrative of broader changes that Davis had made that would also allow him to live successfully outside of a carceral environment. Instead, the panel was left with the opinion that Davis would be dangerous were he to be paroled, and that imposing a death sentence was the only way to prevent that, as a result of Mausser's testimony.

The issue of whether Davis would be paroled, and if so, whether he would present a danger to society was plainly a major factor in the panel's decision regarding whether to impose a death sentence. The errors that trial counsel made in investigating and preparing Mausser and Dr Smith's testimony are substantial enough to undermine our confidence in the outcome of the sentencing hearing. Trial counsel's deficient performance likely negatively impacted the weight the panel assigned to several of Davis's mitigating factors, and thus there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. We therefore hold that Davis is entitled to relief on this claim.

### F. Ineffective Assistance of Counsel for Failing to Properly Advise Davis about Waiving his Right to a Jury Trial

#### 1. Procedural Bar

Davis contends that his conviction cannot stand because his original trial counsel in 1984 failed to advise him of the collateral consequences of waiving his constitutional right to a jury trial. The warden contends that this claim is procedurally defaulted because the Ohio Court of Appeals invoked a procedural bar instead of considering the claim on the merits, and thus review by this court is barred because "the state judgment rests on independent and adequate state procedural grounds." *Coleman v. Thompson*, 501 U.S. 722, 730 (1991). The Ohio Court of Appeals concluded that, "as this court has previously determined, Davis' habitual challenges regarding his jury waiver are barred by the doctrine of res judicata." *Davis XIII*, 2013 WL 4806935, at *7. The Ohio Court of Appeals incorrectly applied the doctrine of res judicata to this claim, however, because Davis's claim relies on evidence outside the record. Because the Ohio Court of Appeals erred in applying the res judicata rule to Davis's claim, it is not procedurally defaulted, and AEDPA deference also does not apply given that his claim was not adjudicated on the merits in state court. 28 U.S.C. § 2254(d); *see also Jones v. Bradshaw*, 46 F.4th 459, 486 (6th Cir. 2022). We review de novo the merits of Davis's claim. *Jones*, 46 F.4th at 486.

#### 2. Ineffective Assistance of Counsel

To the extent that Davis's claim relies on *Padilla v. Kentucky*, 559 U.S. 356 (2010), we conclude that it must fail, because the Supreme Court has held that *Padilla* does not apply retroactively to petitioners whose convictions became final before *Padilla* was decided. *Chaidez v. United States*, 568 U.S. 342, 344 (2013). Because Davis challenges the performance of his original trial counsel in 1984, and *Padilla* was not decided until 2010, Davis cannot benefit from the rule of *Padilla*. Although we vacated Davis's sentence in 2007, his conviction was left undisturbed, and thus *Padilla* cannot apply to claims relating to his conviction alone. And even if we determined that Davis's 2009 resentencing—which did not become final until after *Padilla*—worked to defeat the non-retroactivity of *Padilla* as to Davis's conviction, the rule of *Padilla* still could not help in determining whether Davis's trial counsel performed deficiently in

1984, because the Supreme Court has held that deficient performance is judged based on the prevailing professional norms at the time of trial. *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (per curiam) ("Judging counsel's conduct in the 1980's on the basis of these 2003 Guidelines—without even pausing to consider whether they reflected the prevailing professional practice at the time of the trial—was error."). And the Supreme Court's decision making *Padilla* non-retroactive explains why, in 1984, prevailing professional norms did not require attorneys to inform clients of the collateral consequences of waiving a constitutional right. *Chaidez*, 568 U.S. at 350. Because Davis has not identified any other legal authority to demonstrate that trial counsel performed deficiently, this claim must fail. Finding no deficient performance, we need not address the prejudice prong of Davis's *Strickland* claim.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of relief as to Davis's claims that his trial counsel were constitutionally ineffective for failing to investigate and present mitigating evidence about the circumstances of Davis's prior conviction (claim two) and that his trial counsel provided ineffective assistance by failing adequately to advise him of the collateral consequences of a jury waiver (claim five). We **REVERSE** the district court's denial of relief on Davis's claims that the state violated his constitutional rights by enforcing his 1984 jury waiver against him at his 2009 sentencing hearing (claim one), that his trial counsel provided ineffective assistance by failing to move to recuse Judge Nastoff for bias (claim three), and that his trial counsel were constitutionally ineffective in failing to reasonably prepare and present mitigation evidence at his 2009 sentencing hearing (claim four). We **REMAND** to the district court with instructions to **GRANT** a writ of habeas corpus vacating Davis's death sentence unless the State of Ohio conducts a new sentencing proceeding within 180 days of remand.

---

**DISSENT**

---

JULIA SMITH GIBBONS, Circuit Judge, dissenting.  I join the majority opinion in its affirmance of the district court's denial of relief as to Davis's claims that his trial counsel were constitutionally ineffective for failing to investigate and present mitigating evidence and for failing to adequately advise him of collateral consequences of a jury waiver.  As to the majority's holdings on Davis's other claims, I respectfully dissent and would affirm the district court's denial of Von Clark Davis's petition for writ of habeas corpus.

I.

In his second habeas petition, Von Clark Davis claims that Ohio breached the terms of his jury waiver, trial counsel failed to investigate the circumstances of his prior conviction, trial counsel failed to move to recuse a judge who either was biased or presented the impermissible appearance of bias, trial counsel failed to reasonably prepare for and present mitigation evidence, and trial counsel failed to properly advise him about the effects of waiving his right to a jury. The majority concludes that Davis is entitled to relief on three of his claimed grounds for relief— the enforcement of his 1984 jury waiver, the ineffective assistance of counsel for failing to move to recuse a judge at his 2009 resentencing, and the ineffective assistance of counsel for failing to prepare and present mitigation evidence at his 2009 sentencing.  Maj. Op. at 35.  I disagree.

II.

The majority initially concludes that Davis's right to a jury trial was violated in 2009 when Davis's 1984 jury trial waiver was enforced against him, despite the death of one member of the original three-judge panel and the retirement of the other two.  In so ruling, the majority transforms a waiver of jury trial into a waiver of jury trial only if three particular judicial officers make the sentencing decision.  While it is true that Davis's waiver does mention the names of three particular judges, there is no constitutional right to have a particular judge make any decision in any legal context of which I am aware.  The law considers judges fungible. Interpreting the waiver as the majority does would turn waivers, guilty pleas, and various

proceedings upside down. Judges die, become ill, and leave the bench all the time, without any effect on any waivers or other decisions a defendant may have made about his or her case.

The majority accomplishes this analytical feat by converting the judicial officer who signed the waiver into a party to a contractual agreement with Davis. That is never the judicial role. Judges do not strike bargains with criminal defendants. I would deny relief on this claim.

III.

I would similarly reject Davis's argument that his counsel was ineffective for failing to move for the recusal of a judge, Judge Nastoff, at his resentencing. The Ohio Court of Appeals held that Davis's counsel was not ineffective because the decision not to seek recusal was a reasonable trial strategy. *State v. Davis*, No. CA2012-12-258, 2013 WL 4806935, at *6 (Ohio Ct. App. Sept. 9, 2013).

For an ineffective assistance claim, a petitioner typically must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). But *Strickland* prejudice not need be proven if a petitioner establishes judicial bias because "judicial bias is a structural defect." *Coley v. Bagley*, 706 F.3d 741, 750 (6th Cir. 2013) (citation omitted). Thus, we consider whether the potential for bias violated Davis's due process rights, and, if so, whether the Ohio Court of Appeals unreasonably applied federal law in determining that trial counsel's decision not to seek recusal was strategic. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

The majority concludes that "the probability of actual bias on the part of" Judge Nastoff 'is too high to be constitutionally tolerable.'" Maj. Op. at 24 (quoting *Winthrow v. Larkin*, 421 U.S. 35, 47 (1975)). It reasons that because Judge Nastoff served as a prosecutor in a case against Davis's nephew and "actively cross-examined witnesses on the same mitigation evidence that Davis would later present at his sentencing hearing," counsel's failure to move for his recusal entitled Davis to habeas relief. *Id.* at 22–23.

Davis's claim fails on AEDPA review, however, because it is not clearly established federal law that a judge's prior involvement in the prosecution of a defendant's family member

creates "an impermissible risk of actual bias" in the defendant's case. *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016). *Williams*, the primary case that Davis cites, involved a judge's prior participation as a prosecutor in the same defendant's case. *Id.* at 1. But participation in a family member's case is different than involvement in a defendant's own case. Thus, *Williams* did not clearly establish Judge Nastoff's involvement in Davis's case as a constitutional violation.

The majority opinion grounds its analysis in *Larkin* and *In re Murchison*, 349 U.S. 133 (1955). *See* Maj. Op. at 23 n.3. But *In re Murchison* involved a state law that empowered a judge to sit as a "one man grand jury" and charge crimes, which violated due process because the judge had in effect become part of the prosecution in that same case. 349 U.S. at 138. And while the majority cites *Withrow* for its general statements about judicial bias, the facts of *Withrow* contradict its position. Indeed, *Withrow* rejected a judicial prejudice argument where the adjudicator had previously conducted investigative functions, finding that adjudicators "are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." 421 U.S. at 46–55 (quoting *United States v. Morgan*, 313 U.S. 409, 421 (1941)).

In an attempt to connect Davis's case to those in which a judge previously acted as a prosecutor against the same defendant, the majority asserts that Judge Nastoff was exposed to some of the same mitigation evidence in Davis's trial and the trial of Davis's nephew, Lahray Thompson. Maj. Op. at 23–24. This argument is unpersuasive. First, Davis never clarifies what mitigation evidence appeared at both his and Thompson's trials, leaving us to guess the content and extent of such evidence. Davis does point to the testimony of his sister, Carol Smith, Thompson's mother, and argues that "[g]iven Judge Nastoff's prior attempt to seek the execution of Smith's son, he was predisposed to reject her testimony for Davis." CA6 R. 20, Appellant Br., at 55. But Smith never testified at Thompson's trial, and it is not clear why Judge Nastoff would disregard Smith's testimony simply because he previously prosecuted her son.

Accordingly, I would hold that Davis is not entitled to relief on this claim.

IV.

Finally, in my view, Davis's claim that his trial counsel was ineffective for failing to prepare and present mitigation evidence also fails. Davis contends that trial counsel was ineffective for presenting testimony by Cynthia Mausser, a member of the Ohio Parole Board, and for failing to prepare or revise testimony by Robert Smith, Ph.D., a clinical psychologist, in view of Mausser's testimony.

First, Davis argues that trial counsel—attempting to avoid a death sentence—incorrectly told the three-judge panel that Mausser would testify that Davis would never be paroled. During direct testimony, Mausser hypothesized that an individual with a criminal history comparable to Davis's "would likely spend a large portion of the remainder of their life in prison" and was "unlikely" to be granted parole at a first hearing. DE 5-7, Mitigation Hr'g Tr., Page ID 8365. On cross-examination, Mausser admitted that she could not say with certainty how she or other parole board members would vote should Davis gain parole eligibility.

In light of Mausser's testimony, Davis argues that trial counsel was further ineffective for failing to prepare Smith "for the fact that the possibility of parole was going to be a critical issue" or to testify about "how Davis had changed over time and how, even with borderline personality disorder, he could adapt in society if paroled," and "failed to consider that this psychological evidence was rejected in two previous sentencing hearings involving Davis." CA6 R. 20, Appellant Br., at 71–72. Smith testified that Davis, who was diagnosed with borderline personality disorder, responds well to a structured setting like prison and had shown progress within that setting. Davis's position is that, in the context of Mausser's testimony regarding the possibility of parole, Smith's testimony implied that Davis would pose a danger to society once outside prison's structured environment.

Davis's claim fails on the prejudice prong. The trial court "found that Mausser's testimony was 'entitled to no weight' because it was 'highly speculative and unconvincing.'" *State v. Davis*, 9 N.E.3d 1031, 1056 (Ohio 2014). Similarly, the Ohio Supreme Court "afford[ed] no weight" to Mausser's "speculative" testimony. *Id.* Despite this, the Ohio Supreme Court concluded that Davis was unlikely ever to be released from prison given his age.

Thus, the court came to the conclusion that Davis sought—that his parole was unlikely—even if Mausser's testimony did not accomplish that objective.

Smith's testimony also did not prejudice Davis. Despite Mausser's ineffective testimony, the court believed that Davis would likely spend the rest of his life in prison. Smith testified that Davis suffered from alcohol dependence and borderline personality disorder and that Davis benefitted from the prison environment due to its structure and lack of access to alcohol. Thus, Smith's testimony supported Davis's argument that he would continue the good behavior that he had exhibited while imprisoned, and the court gave weight to Davis's "record of good behavior in prison, both during his earlier incarceration and on death row." *Davis*, 9 N.E.3d at 1056. Smith's testimony therefore did not undermine counsel's strategy of showing that Davis would likely remain in prison and exhibit good behavior during that incarceration.

Because Davis cannot show prejudice, I would deny relief on this claim.

## V.

For these reasons, I would not grant Davis habeas relief. I respectfully dissent.